# United States Court of Appeals

## For the First Circuit

No. 05-1377

UNITED STATES OF AMERICA,

Appellee,

v.

JOSEPH A. LeMOURE,

Defendant, Appellant.

No. 05-1440

UNITED STATES OF AMERICA,

Appellee,

v.

JOSEPH F. POLITO,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Boudin, Chief Judge,

Selya and Lynch, Circuit Judges.

James H. Budreau with whom Gerald Phelps was on brief for appellant Joseph A. LeMoure.

Robert A. George and Robert A. George & Associates, P.C. on brief for appellant Joseph F. Polito.

Nathaniel S. Pollock, Civil Rights Division, Department of Justice, with whom Jessica Dunsay Silver, Civil Rights Division, Department of Justice, Wan J. Kim, Assistant Attorney General, Michael J. Sullivan, United States Attorney, and S. Theodore Merritt, Assistant United States Attorney, were on consolidated brief for appellee.

---

January 29, 2007

---

**BOUDIN, <u>Chief Judge</u>.** Before us are appeals by two Boston police officers, Joseph LeMoure and Joseph Polito, from convictions for a set of related crimes based on attempts to derail investigations into LeMoure's beating of a civilian. The background events are readily summarized, taking a balanced view of the facts consistent with record support.

Early on June 24, 2000, LeMoure pursued and pulled over a car driven by Stephen Duong and accused a passenger--Peter Fratus--of making an insulting gesture directed to LeMoure. LeMoure dragged Fratus from the car, threw him to the ground, punched him and kneed him in the head (whether LeMoure also hit him in the head with a flashlight was disputed at trial). Fratus thereafter filed a complaint with the Boston Police Department, which was investigated by the Department's Internal Affairs Division ("IAD").

In early 2001, Polito--a friend and subordinate of LeMoure's--approached his close friends Dante Tordiglione and Biagio DeLuca and asked them to give false statements to the IAD supporting LeMoure. When they agreed, Polito instructed them concerning the content of those statements. LeMoure asked his close friend Joseph Weddleton to help him secure a "witness" to the incident. Weddleton approached Ralph DeRota, a mutual friend who lived near the location of the incident, to request that he give a false statement to the IAD.

Despite the statements given by Tordiglione, DeLuca, and DeRota, LeMoure was suspended. Fratus then filed a civil suit against LeMoure. In the summer of 2002, prior to a deposition in the civil case, Weddleton met with DeRota at LeMoure's suggestion to refresh DeRota's memory of his false IAD testimony, which DeRota then repeated in the deposition. When DeLuca and Tordiglione hesitated to lie at their own depositions, LeMoure and Polito pressed them to stand fast. Polito provided DeLuca and Tordiglione with copies of their false statements to the IAD in order to prepare them for their depositions. LeMoure also offered to pay Tordiglione $10,000 for his trouble.

DeLuca repeated his false IAD testimony in his deposition; Tordiglione claimed not to remember the incident, but stated that his IAD testimony was true and based on his memory. LeMoure, who was also deposed, testified that he did not strike Fratus or pull him out of the car, and that he had not met DeRota, DeLuca, or Tordiglione prior to their coming forward as witnesses. The civil suit settled, but a grand jury investigation of the incident had begun.

When DeLuca was subpoenaed by the grand jury, LeMoure urged him to stick with his story, and Polito gave him $7,000 for his attorney's fees, stating that the money came from LeMoure. Polito also met with Tordiglione and DeLuca concerning DeLuca's subpoena; in response to Tordiglione's expression of concern,

-4-

Polito urged the two not to waver.  In the end, Tordiglione and DeRota testified truthfully to the grand jury in exchange for immunity, and DeLuca did so in exchange for a plea agreement including a government recommendation of probation.  In July 2003, Polito and LeMoure were indicted for a succession of offenses relating to their obstructive conduct.

After a jury trial, Polito and LeMoure were convicted on the counts listed in the margin, including conspiracy, witness tampering, perjury and subornation, and obstruction of justice.[1]  Thereafter, they were sentenced to terms of 36 and 48 months, respectively.  They now appeal; most of the claims raise issues of law which we review de novo, United States v. Coplin, 463 F.3d 96, 100 (1st Cir. 2006); issues of fact and judgment calls are reviewed with more deference.  Id.

---

[1]Both were convicted of conspiracy to obstruct justice, 18 U.S.C. § 371 (2000) (Count Two); witness tampering, id. § 1512(b), in connection with Tordiglione's deposition (Count Five), DeLuca's deposition (Count Six), and DeLuca's grand jury testimony (Count Twelve); subornation of perjury, id. § 1622, in connection with DeLuca's deposition (Count Eight); and obstruction of justice, id. § 1503, for fabricating witness testimony in the civil case (Count Nine) and for attempting to persuade DeLuca and Tordiglione to give false testimony to the grand jury (Count Ten).  Polito was also convicted of witness tampering in connection with Tordiglione's grand jury testimony (Count Eleven) and LeMoure of witness tampering and subornation of perjury in connection with DeRota's deposition (Counts Four and Seven, respectively) and perjury, id. § 1623, for his own deposition statements (Counts Thirteen and Fourteen).

We begin with Polito's arguments, starting with his claim that the district court should have dismissed the obstruction of justice counts (Counts Nine and Ten) because section 1503, 18 U.S.C. § 1503, does not embrace witness tampering. He points out that Congress in 1982 amended section 1503 to eliminate any explicit reference to "witnesses" and enacted in its place the witness tampering statute, 18 U.S.C. § 1512. Victim and Witness Protection Act, Pub. L. No. 97-291 (1982).

The government responds that although section 1503 was amended to remove any explicit reference to witnesses, its omnibus "due administration of justice" clause continues to cover witness tampering. Pertinently, section 1503 makes it unlawful to

> corruptly . . . endeavor[] to influence . . . any grand or petit juror, or officer in or of any court of the United States . . . or corruptly . . . influence[], obstruct[], or impede[], or endeavor[] to influence, obstruct, or impede, the due administration of justice.

Section 1512(b)(1) focuses on witnesses (as well as victims and informants), and makes it unlawful to:

> knowingly use[] intimidation, threaten[], or corruptly persuade[] another person, or attempt[] to do so, or engage[] in misleading conduct toward another person, with intent to--(1) influence, delay, or prevent the testimony of any person in an official proceeding.

Admittedly, Polito is supported by the canon, instructive rather than mandatory, that a specific treatment prevails over a

-6-

more general provision, United States v. Lara, 181 F.3d 183, 198 (1st Cir.), cert. denied, 528 U.S. 979 (1999); the canon has added force where, as here, the term "witness" was deleted from the broader statute at the same time the new, more specific statute was adopted. The Second Circuit has taken this restrictive view, but the other circuits that have spoken on this issue are all opposed,[2] and with good reason.

Section 1503 was enacted with two objectives: to protect witnesses, jurors, and court officers, and to "prevent a miscarriage of Justice by corrupt methods." United States v. Lester, 749 F.2d 1288, 1292 (9th Cir. 1984). The term "witness" was indeed deleted in 1982 from the first clause of section 1503; but Congress left intact the omnibus clause forbidding efforts to obstruct the due administration of justice, which had previously been read by courts to encompass the corrupt persuasion of witnesses.[3]

---

[2]Compare United States v. Masterpol, 940 F.2d 760, 762-63 (2d Cir. 1991), with United States v. Ladum, 141 F.3d 1328, 1337-38 (9th Cir.), cert. denied, 525 U.S. 1021 (1998); United States v. Tackett, 113 F.3d 603, 609-11 (6th Cir. 1997), cert. denied, 522 U.S. 1089 (1998); United States v. Maloney, 71 F.3d 645, 658-59 (7th Cir. 1995), cert. denied, 519 U.S. 927 (1996); United States v. Kenny, 973 F.2d 339, 342-43 (4th Cir. 1992); United States v. Moody, 977 F.2d 1420, 1423-24 (11th Cir. 1992), cert. denied, 507 U.S. 944 (1993); and United States v. Williams, 874 F.2d 968, 977 n.25 (5th Cir. 1989).

[3]E.g., United States v. Nicosia, 638 F.2d 970, 974-75 (7th Cir. 1980), cert. denied, 452 U.S. 961 (1981); United States v. Johnson, 605 F.2d 729, 730 (4th Cir. 1979), cert. denied, 444 U.S. 1020 (1980); cf. Haili v. United States, 260 F.2d 744, 746 (9th

-7-

Further, when section 1512 was initially enacted in 1982, it dealt only with the use or threat of force against a witness; the ban on corrupt persuasion was added only later in 1988. Anti-Drug Abuse Act of 1988, Pub. L. 100-690, § 7029(c) (1988). It is improbable that, in 1982, Congress meant to adopt (in section 1512) a specific ban against forcible intimidation while impliedly narrowing (in section 1503) the omnibus clause so as to decriminalize corrupt but non-forcible interference with witnesses.

Thus, over and above the general presumption against repeals merely by implication, United States v. United Cont'l Tuna Corp., 425 U.S. 164, 168 (1976), this implied repeal would mean that Congress had meant in 1982 to reduce the protection afforded against soft witness tampering at the very time that it was trying to expand protection of witnesses. Yet the statute's purpose was "to enhance and protect the necessary role of . . . witnesses in the criminal justice process . . . ." Victim and Witness Protection Act of 1982, Pub. L. 97-291, § 2(b)(1)-(2).

Although we reach this result without any reliance on post-1982 legislative history, it completes the story to note Senator Biden's statement in 1988 when Congress amended section 1512 to cover non-coercive witness tampering. In reporting the bill out of committee, Senator Biden explained the amendment as

_____

Cir. 1958).

> intended . . . merely to include in section 1512 the same protection of witnesses from non-coercive influence that <u>was (and is)</u> found in section 1503. It would permit prosecution of such conduct in the Second Circuit, where it is not now permitted, and would <u>allow</u> such prosecutions in other circuits to be brought under section 1512 rather than under the catch-all provision of section 1503.

134 Cong. Rec. S17,369 (1988) (statement of Sen. Biden) (emphasis added).

Polito's next argument concerns the phrase "misleading conduct" in the witness tampering statute, section 1512(b)(1). That statute makes unlawful "misleading conduct toward another person" in order "to influence the testimony of any person" <u>and</u> efforts to "corruptly persuade" another person in order to influence his testimony. The evidence easily supported a conviction on this latter theory. But, Polito argues, the jury might have relied instead on the "misleading conduct" phrase, thinking it sufficient that he had merely asked a <u>witness</u> to engage in misleading conduct.

The jury was told (twice) that the <u>defendant</u> had to "engag[e] in misleading conduct" toward another person with the intent to influence, delay or prevent "the testimony of a person" in the proceeding. Moreover, the evidence of corrupt persuasion was overwhelming; it is highly improbable that the jury would instead have convicted on a less salient misleading-the-tribunal

-9-

theory, even assuming that the instructions did not adequately negate it.

Polito makes two other related attacks on the instructions as to section 1512(b)(1). First, he says, the court did not sufficiently explain that, under the statute, the corrupt persuasion must be done "knowingly"--a term that Arthur Andersen, LLP v. United States, 544 U.S. 696, 705-07 (2005), later held to require "consciousness of wrongdoing," id. at 706. At trial, both Polito and the government had focused on "corrupt" rather than on "knowingly" as the key to scienter.

In our case the term "knowingly" was included in the instructions but not with the gloss ("consciousness of wrongdoing") later supplied by Arthur Andersen. The government says that the judge's instruction on the meaning of "corruptly"--that the jury must find that the defendant acted "with an improper purpose"-- necessarily entails consciousness of wrongdoing. An instructing judge who took Arthur Andersen for all it could be worth might find this equation debatable.

But the situation in Arthur Andersen was dramatically different than the one here. At issue there was the arguable misuse of an otherwise legitimate document destruction policy, and the trial court had instructed the jury that it could convict "even if [the defendant] honestly and sincerely believed that its conduct was lawful . . . ." 544 U.S. at 706. Neither defendant in this

-10-

case could conceivably have thought that urging witnesses to lie in official proceedings was lawful.

Polito makes a second effort to mine Arthur Andersen. The Court said that the instructions there had failed to convey the necessary nexus between the corrupt persuasion and the intent to affect a particular official proceeding. See id. at 707; see also United States v. Aguilar, 515 U.S. 583, 598-600 (1995). On the facts of Arthur Andersen, the concern was legitimate; in our case, the persuasion was largely aimed at official proceedings and the instructions were adequate.

Specifically, the jury was told as to section 1512(b)(1) that the defendant had to have a specific intent to influence "testimony of a person in an official proceeding"; the civil depositions and the grand jury inquiry were so identified in the instructions; and the indictment identified the official proceeding of concern in each count under section 1512(b)(1). This was not a case of mere lies to investigators disconnected from proceedings.[4]

Boilerplate instructions as to section 1512 given after Arthur Andersen are likely to be different than those used in cases like this one, tried before Arthur Andersen. But neither of the

---

[4]Polito makes the same nexus claim as to the section 1503 counts, but the jury was instructed that, as to those counts, it needed to find that an official proceeding was pending, that the defendants "knew of the pending proceeding," that they acted corruptly to influence it, and that their acts had "the natural and probable effect of interfering with the due administration of justice."

-11-

concerns that legitimately troubled the Supreme Court were presented by the facts in this case. Failure to anticipate post-trial changes in the law can pose troubling issues, but in this case, the understandable failure to anticipate future precedent had no ill effects.

Polito's next set of claims are that certain of the counts are duplicative in violation of double jeopardy principles. These claims were not raised in the district court, so we review for plain error. United States v. Patel, 370 F.3d 108, 114 (1st Cir. 2004). Since there was no error at all, the claims fail at the first step of the Olano plain error analysis. See United States v. Olano, 507 U.S. 725, 734 (1993).

Polito says that his convictions for violating section 1512(b)(1) and section 1503 must be vacated because they constitute multiple punishments for the same offense. Multiple punishments for the same offense, unlike multiple trials, are permissible if the legislature so intended. Missouri v. Hunter, 459 U.S. 359, 365 (1983). Here, no showing of legislative intent is necessary because the offenses are different under the default analysis prescribed by Blockburger v. United States, 284 U.S. 299, 304 (1932).

In two of the section 1512(b)(1) counts (Counts Five and Six), Polito was charged with tampering with two different witnesses concerning their depositions in the civil case; in a

section 1503 count (Count Nine), he was charged with obstructing justice by fabricating witness testimony in the civil case. Parallel counts were charged concerning the grand jury testimony. In Count Ten, Polito was charged with obstructing the grand jury by fabricating witness testimony; Counts Eleven and Twelve charged him with tampering with specific grand jury witnesses. But under the Blockburger test, whether two offenses are the same depends on the elements of the crimes and not the similarity of underlying facts. 284 U.S. at 304.

Here, contrary to Polito's argument, each offense requires one or more elements not required for the other offense. Section 1512(b)(1) requires proof that one intend to "influence, delay, or prevent . . . testimony of any person" (emphasis added); section 1503 does not require such an element. Conversely, section 1503 as read by the Supreme Court requires an attempt to obstruct a pending judicial proceeding, Aguilar, 515 U.S. at 599 (citing Pettibone v. United States, 148 U.S. 197, 206 (1893) (construing predecessor statute)); no such requirement of a pending proceeding exists in section 1512. See 18 U.S.C. § 1512(f).

Polito also claims that Count Six, charging him with witness tampering as to DeLuca's civil deposition testimony, is merely a lesser included offense of Count Eight, which charged subornation of perjury as to DeLuca's civil deposition testimony. 18 U.S.C. § 1622. Again, the answer is the same: witness tampering

-13-

under section 1512(b)(1) and subornation of perjury under section 1622 each require an element that the other does not, so neither can be a lesser included offense as to the other.

Section 1622 requires proof of actual perjury, while section 1512(b)(1) does not; the latter is directed at specified acts of tampering. Conversely, section 1512(b)(1) requires proof of a nexus with "an official proceeding"; by contrast, section 1622 can be satisfied by procuring a person to lie materially in "any declaration, certificate, verification, or statement under penalty of perjury," 18 U.S.C. § 1621, without any nexus to an official proceeding.

We now turn to LeMoure's arguments. As to his conviction, LeMoure says that the district court erred concerning a single piece of testimony. During the trial, Weddleton testified that he had talked with LeMoure shortly before he (Weddleton) was to appear before the grand jury, and that LeMoure had raised the possibility that Weddleton might plead his Fifth Amendment privilege against self-incrimination. LeMoure's trial counsel did not object or request a cautionary instruction.

LeMoure now says that it was plain error for the judge to fail to caution the jury that this mention of the Fifth Amendment did not constitute witness tampering. We will assume arguendo that, had LeMoure requested a cautionary instruction, the court's failure to give one would have been error. Whether the failure to

-14-

give the instruction sua sponte can be regarded as error at all is a quite different question.

If a judge misstates the law in an instruction, this is error. But if counsel has not objected to evidence or asked for a cautionary instruction, it does not necessarily follow that the judge has erred by tolerating the evidence or withholding a caution. Lawyers sometimes think that "objectionable" testimony from an adverse witness helps more than it hurts or that a cautionary instruction will underscore testimony best ignored.

The district court is not required to "act sua sponte to override seemingly plausible strategic choices on the part of counselled defendants." United States v. De La Cruz, 902 F.2d 121, 124 (1st Cir. 1990). Although one could describe such choices as waivers of claims of error, United States v. Yu-Leung, 51 F.3d 1116, 1121-22 (2d Cir. 1995), others might say that there is no error at all when counsel is content and forgoes an optional objection. United States v. Smith, 459 F.3d 1276, 1299-1304 (11th Cir. 2006) (Tjoflat, J., specially concurring).[5]

In all events, the claim of plain error fails here because there is no indication that the Fifth Amendment reference or the lack of a cautionary instruction probably altered the

---

[5]Of course, in a criminal case, counsel's choices may fall below the requisite standard of care and open the way to a claim of ineffective assistance of counsel, but no such charge is made in this case (nor, as we will see, could prejudice be established if it were made).

result.  <u>United States</u> v. <u>Dominquez Benitez</u>, 542 U.S. 74, 82 (2004).  The government never charged LeMoure with tampering with Weddleton's testimony and never argued to the jury that the Fifth Amendment suggestion betrayed some improper motive bearing on counts involving other witnesses with whom LeMoure clearly tampered.  Given the ample evidence of the latter, nothing in the Weddleton episode carried much weight.

LeMoure's last argument concerns his sentencing.  The guideline calculations were complicated partly because the guidelines required separate calculations for one group of offenses related to the civil case and another to the grand jury proceeding. The calculation followed by the district court is set forth in the appendix to this decision; but the dispute in this case relates only to one decision: a cross-reference required at one stage in the calculation process.

Where an offense involves obstructing the investigation or prosecution of a criminal offense, the guidelines instruct that the base offense level should be that of an accessory after the fact for the underlying crime if that level is greater than the offense level for obstruction itself. U.S.S.G. § 2J1.2(c)(1).  An accessory after the fact is assigned an offense level 6 levels below that prescribed for the underlying offense.  <u>Id.</u> § 2X3.1.

The pre-sentence report ("PSR") determined that the underlying offense under investigation by the grand jury was a

violation of federal civil rights, 18 U.S.C. § 242--of which LeMoure was charged, but on which the jury deadlocked--but that guideline directs the use of the guideline for the conduct underlying the civil rights offense, if the latter's offense level is higher than level 10.  U.S.S.G. § 2H1.1(a)(1), (3)(A).  The PSR concluded that the offense conduct underlying the section 242 charge was aggravated assault, with a base offense level of 14.

Aggravated assault is assault that involved "a dangerous weapon with intent to cause bodily injury."  Id. § 2A2.2 app. n.1. In this case, the dangerous weapon was the flashlight that (according to Fratus) LeMoure used to beat Fratus.  The PSR then added four levels for use of a dangerous weapon, three more for bodily injury, six levels because LeMoure was a public official, and two more because of LeMoure's managerial role.  See id. §§ 2A2.2(b)(2)(B), 2A2.2(b)(3)(A), 2H1.1(b)(1), 3B1.1(c).

Other adjustments, not themselves in dispute, led to a combined offense level of 24 and, after factoring in criminal history, a guideline range of 51 to 63 months.  After considering the factors listed in 18 U.S.C. § 3553, the court imposed a sentence of 48 months.  But for the decision to cross-reference the aggravated assault guideline, the ultimate offense level would have been lower and the sentence might have been lower as well.

LeMoure objects that the grand jury did not charge him with using a flashlight to beat Fratus.  Instead, the indictment

merely alleged that he "willfully assault[ed Fratus] by forcibly removing him from the . . . car, throwing him to the ground, and striking and kneeing him in the head."  LeMoure also says that grand jury testimony by a doctor raises doubts about the use of a flashlight and that, at the very least, he is entitled to an evidentiary hearing on whether he used a flashlight.

The cross-reference looks to what the grand jury was investigating, not what indictment was returned or what crime actually occurred.  United States v. Conley, 186 F.3d 7, 23-24 (1st Cir. 1999), cert. denied, 529 U.S. 1017 (2000).  Otherwise, "obstructors of justice would benefit from . . . obstruction that successfully persuaded a grand jury not to return an indictment." Id. at 25.  Nor is LeMoure's knowledge of the specific offenses under investigation relevant.  Id.

In this case, the district court found that the grand jury was investigating the beating as an aggravated assault, given Fratus' allegations that LeMoure had used a flashlight as a weapon. This factual determination was not clearly erroneous.  Whether LeMoure did in fact use his flashlight to beat Fratus is not controlling.  For the same reason, an evidentiary hearing as to the use of the flashlight was properly denied.

Affirmed.

The PSR, which the district court adopted, began by dividing the counts into two groups. U.S.S.G. § 3D1.1 (2004). Group 1 contained the counts relating to the civil case; Group 2 contained the counts relating to the grand jury investigation.

Generally, the guidelines prescribe a base offense level of 14 for obstruction of justice. U.S.S.G. § 2J1.2. This offense level was adjusted upward by 4 levels to reflect LeMoure's role as an organizer or leader of a criminal activity involving five or more participants, yielding an offense level of 18. This offense level applied to Group 1. However, the guidelines provide that, "if the offense involved obstructing the investigation or prosecution of a criminal offense"--a condition that applied to Group 2 but not Group 1--then the sentencing court should apply section 2X3.1 (Accessory After the Fact) if the resulting offense level would be greater. U.S.S.G. § 2J1.2(c)(1).

Section 2X3.1, in turn, provides for an offense level 6 levels lower than the underlying offense. In this case, the PSR determined that the underlying offense was the violation of section 242 charged in Count One; the guideline applicable to that offense is section 2H1.1 (Offenses Involving Individual Rights). In pertinent part, section 2H1.1 prescribes a base offense level that is the greater of 10, U.S.S.G. § 2H1.1(a)(3)(A), or "the offense level from the offense guideline applicable to any underlying

offense." U.S.S.G. § 2H1.1(a)(1). The PSR determined that the offense underlying the section 242 charge was aggravated assault, defined as an assault that involved "a dangerous weapon with intent to cause bodily injury." U.S.S.G. § 2A2.2 app. n.1. The PSR identified the flashlight allegedly used to beat Fratus as the dangerous weapon.

The guideline for aggravated assault, U.S.S.G. § 2A2.2, provides for a base offense level of 14, to which the PSR added 4 levels for use of a dangerous weapon, U.S.S.G. § 2A2.2(b)(2)(B), and 3 levels for bodily injury, U.S.S.G. § 2A2.2(b)(3)(A), for an offense level of 21. The PSR then returned to the section 2H1.1, and increased the offense level of the cross-referenced aggravated assault an additional 6 levels because LeMoure was a public official at the time of the offense, U.S.S.G. § 2H1.1(b)(1), yielding an offense level of 27. Referring back to section 2X3.1, the PSR subtracted 6 levels for a base offense level of 21, and adjusted that level upward by 2 levels because of LeMoure's managerial role, U.S.S.G. § 3B1.1(c), for a total Group 2 offense level of 23.

As directed by section 3D1.3, the PSR applied the Group 2 offense level of 23 because it was higher than the Group 1 offense level of 18. To account for Group 1, it added one level, U.S.S.G. § 3D1.4, for a combined offense level of 24. Given LeMoure's criminal history, that offense level yielded a range of

51 to 63 months.  After considering the section 3553 factors, the court imposed a sentence of 48 months.