# United States Court of Appeals
## For the First Circuit

No. 13-1805

UNITED STATES OF AMERICA,

Appellee,

v.

HECTOR RODRIGUEZ, A/K/A BOLO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Howard, Circuit Judge,
Kayatta, Circuit Judge,
and McCafferty,[*] District Judge.

Katherine C. Essington, for appellant.
Kelly Begg Lawrence, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

July 16, 2014

[*] Of the District of New Hampshire, sitting by designation.

**McCAFFERTY, <u>District Judge</u>**. Hector Rodriguez appeals his convictions for distributing cocaine base under 21 U.S.C. § 841(a)(1). He challenges: (1) decisions by the district court that allowed the jury to review previously admitted video and audiotapes in the courtroom, and in the presence of alternate jurors, the court, and the parties; (2) the lack of a limiting instruction directing the jury not to draw negative inferences from the fact that law-enforcement officers possessed photographic images of him; and (3) his sentencing as a career offender. We affirm.

## I. The Jury's Review of Evidence

Rodriguez was convicted on three counts of distributing cocaine base. The evidence against him included testimony from a cooperating witness who purchased cocaine base from him on three occasions, plus video and audiotapes of those transactions.

In its jury charge, the court explained that "all of the exhibits except for the video and audiotapes have been loaded onto what we call JERS, the Jury Evidence Retrieval System, that is in the jury room." With regard to the video and audiotapes, the court explained:

> We are unable to load the video or audiotapes . . . onto JERS. So, if you need to see them or hear conversations, you're going to need to come ask to come back into the courtroom, and we will play whatever it is that you want. There will not be any further argument from counsel. I'm not going to give you any further instructions, but if you wanted to

> resee exhibit whatever, just say the word, and
> we will bring you in here.  We will set that
> up for you.

Rodriguez made no contemporaneous objection to the procedure outlined by the court for giving the jury access to the audio and video footage.

After explaining, in its jury charge, that two extra jurors had been impaneled, the court designated two of the fourteen impaneled jurors as alternates, and told the alternates that they were not allowed to deliberate.  The court then dismissed the twelve jury members and the two alternates to eat lunch together, reminding the alternates not to discuss the case with the regular jurors during lunch, and telling them that they would be removed from the jury room when it was time for the jury to begin its deliberations.

Early in its deliberations, the jury notified the court that it wanted to see several videotapes and listen to several audiotapes that had been introduced into evidence.  Shortly after the court received the jury's requests, the alternates and the regular jurors were brought into the courtroom.  After they arrived, the court said this to the jury:

> Now, I'm not sure that you all realize
> that the videos themselves are fairly lengthy.
> They're 30 or 40 minutes long each.  If you
> want, we will play them in their entirety; or
> if there is a specific area that you would
> like to have replayed, we can do that as well.
> I'm not going to ask you to tell me right now.
> . . .  Let us play [the audiotapes of] the

phone calls for you so that we have those out
of the way. And then I'm going to ask you to
go back and discuss amongst yourselves . . .
whether you want the entire videos played or
certain discrete parts.

At sidebar, Rodriguez's counsel expressed concern over the presence

of the alternates while video and audio footage was being played

for the deliberating jury. The court stated its opinion that the

alternates should be included in the viewing, given the possibility

that an alternate might be needed to replace a juror who became

unable to continue. After the court decided that the alternates

would be included, Rodriguez's counsel asked whether they should be

placed closer to a monitor. In response, the court directed the

alternates to sit in the jury box, with the jury, in the same seats

they had occupied during the trial. Rodriguez did not object.

After the jury had listened to the audiotapes it had

asked to hear, the following exchange took place:

THE COURT: . . . .

I think that's all of the audiotapes
that you had all asked for. So what I'm going
to need you to do is caucus with the jurors
and find out whether you would like the entire
[videotapes] or excerpts.

JUROR: Excerpts.

THE COURT: Okay.

JUROR: From approximately 2 minutes
prior to each transaction from the videos,
please.

After court personnel spent some time trying to cue up the excerpts the jury requested, with limited success, the court dismissed the jury to the jury room and the alternates to the alternate room. When the jury and the alternates were returned to the courtroom, the court seated the alternates apart from the jury, at one of the counsel tables. Several excerpts from the videotapes were played, and after some ensuing confusion over the other excerpts it wanted to see, the jury conferred, in the courtroom, to resolve that confusion. While the jury was conferring, Rodriguez's counsel said, at sidebar: "Judge, I don't know how to say it other than to say, I almost feel like I'm part of their deliberation." The court responded: "I agree. I really do not like how we're doing this." The sidebar concluded with the court saying: "This is really unacceptable." After several more excerpts were played, the court dismissed the jury: "We're going to let you return . . . to the jury room and continue deliberation."

With respect to the jury's review of evidence in the courtroom during the course of its deliberations, three separate decisions by the district court are before us for review. They are the court's decisions to: (1) have the alternates in the courtroom when the jury reviewed video and audio footage; (2) place the alternates in the jury box for the playing of the audiotapes; and (3) have the jury confer in front of the judge, the prosecutors,

the defendant, and defense counsel, about which excerpts from the videotapes it wanted to see.[1]

When a challenge to the manner in which a district court has handled a jury's request to review evidence has been properly preserved, we normally review the court's action for abuse of discretion.  See United States v. Saunders, 553 F.3d 81, 86 (1st Cir. 2009) (citing United States v. Hyson, 721 F.2d 856, 865 (1st Cir. 1983)).  That is the standard that applies to our review of the court's decision to have the alternates present in the courtroom while the jury reviewed video and audio footage.  The court's placement of the alternates in the jury box for the playing of the audiotapes and its directive that the jury confer in the courtroom, however, are reviewed for plain error, see Fed. R. Crim. P. 52(b), because those issues were not properly raised at trial and preserved for review.

### A. Exposing Jurors to Alternates in the Courtroom

Rodriguez argues that the district court violated Rule 24(c)(3) of the Federal Rules of Criminal Procedure by bringing the alternate jurors into the courtroom along with the regular jurors.  But, the basic purpose of Rule 24(c)(3) is to protect the alternates from outside influences.  The gravamen of Rodriguez's appeal is that the court failed to protect the regular jurors from

---

[1]   The court did make one other decision, to place the alternates at counsel table for the playing of the videotapes, but Rodriguez does not appear to challenge that decision.

-6-

outside influences, including those that may have come from the alternates. Thus, rather than focusing on Rule 24(c)(3), we frame our analysis in terms of a criminal defendant's Sixth Amendment right to an impartial jury. See United States v. Olano, 507 U.S. 725, 737-38 (1993) ("[T]he primary if not exclusive purpose of jury privacy and secrecy is to protect the jury's deliberations from improper influence."). That said, the district court did not abuse its discretion by having the alternates present in the courtroom with the jury.

An abuse of discretion occurs "only 'if no reasonable person could agree with the judge's ruling.'" United States v. Jones, 748 F.3d 64, 69 (1st Cir. 2014) (quoting United States v. Maldonado, 708 F.3d 38, 42 (1st Cir. 2013)). Here, immediately after the court designated the alternates, they were instructed generally that they did "not get to deliberate." And when the jury and the alternates were dismissed together for lunch moments later, the jury was instructed not to discuss the case until after the alternates were removed from the jury room. While additional instructions might have been given when the jury and the alternates returned to the courtroom, the alternates are presumed to have followed the instructions they had already been given regarding their exclusion from deliberation. See United States v. Rodriguez, 675 F.3d 48, 63 (1st Cir. 2012) (citing United States v. Gentles, 619 F.3d 75, 82 (1st Cir. 2010); United States v. Salley, 651 F.3d

159, 167 (1st Cir. 2011)).  In addition, the only place where the jury and the alternates came into contact was in the courtroom, under the watchful eye of the judge, who was in a prime position to ensure that the alternates did not discuss the case verbally or communicate with the regular jurors in any other way, see Olano, 507 U.S. at 739 (pointing out that alternates could "actually participate[] in the [jury's] deliberations, verbally or through body language") (internal quotation marks omitted).

Given the location of the contact between alternates and the jury, the facts of this case are more benign than those of Olano, in which the Court held that it was not prejudicial to the defendant for the district court to send alternates into the jury room during deliberations, see 507 U.S. at 741.  If the district court in Olano did not prejudice the defendant by sending alternate jurors into the jury room, where they were subject to no judicial observation, we cannot say that the court in this case abused its discretion by having the alternate jurors in the courtroom, in plain sight, while the jury reviewed video and audio footage.

B. Exposing Jurors to Alternates in the Jury Box

The court's decision to place the alternates in the jury box when audiotapes were played for the jury, to which Rodriguez did not object, is reviewed for plain error.  Plain error is "a very stiff standard," Jones, 748 F.3d at 69, that is "famously difficult . . . to meet," United States v. Acosta-Colón, 741 F.3d

-8-

179, 192 (1st Cir. 2013). To meet that standard, Rodriguez must show: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Batchu, 724 F.3d 1, 7 n.4 (1st Cir. 2013) (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)). To show that an error by the district court affected his substantial rights, Rodriguez must show prejudice. See Jones, 748 F.3d at 69; see also Olano, 507 U.S. at 734. For an error to be prejudicial, it must have been an "error [that] likely 'affected the outcome of the district court proceedings.'" United States v. Rodriquez, 735 F.3d 1, 13 (1st Cir. 2013) (quoting United States v. Hebshie, 549 F.3d 30, 44 (1st Cir. 2008)).

To determine whether the court committed plain error by placing the alternates in the jury box, we must identify the legal principle under which that action might have been erroneous. As with the decision to allow the alternates into the courtroom in the presence of the jury, we apply the principle of jury privacy and secrecy that ensures a criminal defendant's Sixth Amendment right to an impartial jury.

The district court did not err by placing the alternates in the jury box. To be sure, that move placed the alternates in close physical proximity to the regular jurors. But, given that

the alternates had been instructed not to discuss the case with the jury, we cannot say that the court erred by placing them in the jury box, where any violation of their instructions would be openly visible and easily remedied. Absent any error, much less an error that was plain, the court's placement of the alternates in the jury box during the audio playback survives plain-error review. See Batchu, 724 F.3d at 7 n.4. Moreover, even if we were to presume an error, and that it was plain, Rodriguez comes nowhere close to establishing prejudice or either a serious impairment of the fairness, integrity, or public reputation of his trial, or any threat of a miscarriage of justice, which is another phrase we have sometimes used to characterize the fourth prong of the plain-error test, see Jones, 748 F.3d at 69; United States v. Paladin, 748 F.3d 438, 452 (1st Cir. 2014) (treating "caused a miscarriage of justice" and "seriously undermined the integrity or public reputation of judicial proceedings" as interchangeable) (citation omitted).

### C. Directing Jury to Confer in the Courtroom

The court's decision to direct the jury to confer in the courtroom to determine which parts of the video footage it wanted to see is also reviewed for plain error. Again, the operative legal principle is "that the deliberations of the jury shall remain private and secret." Olano, 507 U.S. at 737 (citation and internal quotation marks omitted).

Even assuming that Rodriguez has satisfied the first two prongs of the plain-error test set out in Batchu,[2] his argument fails because he has not satisfied the third prong, which is prejudice. See Olano, 507 U.S. at 737 (assuming error and addressing prejudice). Rodriguez's theory is that, with regard to at least some of the videotapes it viewed, the jury was forced to make its decisions about how much videotape to view while under the scrutiny of a judge who, by asking whether the jury wanted to see whole tapes or excerpts, had expressed an opinion – or at least suggested – that the jury might not need to view the tapes in their entireties.[3] So, Rodriguez's argument goes, some jurors may have been inhibited by their perception that the judge believed that the jury did not need to see all that much videotape and, for that reason, may have demurred from pressing for longer replays.

The principles that guide our analysis come from Olano. In that case, the Court held that "[t]he presence of alternate

_____

[2] If we were to reach the issue of whether the district court erred by directing the jury to confer in the open courtroom, we would not be persuaded by the government's argument that the jury communications in this case were not deliberation. To the contrary, when the jury formed, and then announced, in open court, decisions about which parts of the videotapes it wanted to see, it was forming and expressing opinions about the relative importance of the evidence before it.

[3] Rodriguez also argues that the district court erred by having the jury view the videotapes in his presence, and in the presence of counsel, but he develops no argument concerning prejudice that may have resulted from the presence of anyone other than the judge.

jurors during jury deliberations is not the kind of error that affects substantial rights independent of its prejudicial impact." 507 U.S. at 737 (brackets and internal quotation marks omitted). After pointing out that the respondents in that case did not make a specific showing of prejudice, id., the Court went on to say that on the facts of the case before it, it saw "no reason to presume prejudice," id. The Court concluded its prejudice analysis by stating that "we [do not] think that the mere presence of alternate jurors entailed a <u>sufficient</u> risk of 'chill' to justify a presumption of prejudice on that score." Id. at 741 (emphasis added).

Here, when asked at oral argument to identify exculpatory evidence that the jury did not see, which, in turn, might contribute to a specific showing of prejudice, Rodriguez's counsel was unable to identify any. While counsel argued that Rodriguez could show prejudice, all she offered to support that argument was the fact that the jury conferred in the courtroom. She did mention the possibility of a chilling effect on the jury's deliberations. But other than the possible influence of the judge, counsel identified nothing in the circumstances of this particular case to suggest: (1) how deliberations might have been chilled by the presence of people other than the judge in the courtroom; or (2) that deliberations were actually chilled. In short, Rodriguez has not established prejudice.

His argument, then, rests almost entirely on the premise that it was presumptively prejudicial to his defense for the court to direct the jury to deliberate in the courtroom. In view of Olano, we cannot agree. In that case, the trial court sent alternates into the jury room during deliberations, and did so for the same reasons that prompted the court in this case to have the alternates review audio and video footage along with the regular jurors. See Olano, 507 U.S. at 727-29. In its opinion, the Court explained that "[t]here may be cases where an intrusion should be presumed prejudicial," id. at 739, but then held that the Court of Appeals was incorrect in determining that it was presumptively prejudicial, on the facts of that case, for the trial court to send alternates into the jury room, id. at 740. Those facts included express instructions that "the alternates must not participate in the deliberations," id., instructions that the alternates are presumed to have followed, see id.

The facts of this case give us no reason to reach a result different from the result in Olano. For one thing, while Rodriguez's theory is based on interpreting the words the judge spoke to the jury as chilling its desire to view as much videotape as it may have wanted to see, those words are much more reasonably understood as expressing a concern about burdening the jury by screening footage it did not want to see. For example, the judge prefaced his comments on showing the videotapes by expressing his

belief that the jury did not know how long the videotapes actually were.[4]  Second, as to the possible influence of what the judge said to the jury, the trial transcript shows that even though the judge twice offered the jury the chance to confer to determine what parts of the videotapes it wanted to see, the jury already had an answer to that question: "[e]xcerpts . . . [f]rom approximately 2 minutes prior to each transaction from the videos."  The timing of that response reveals the likelihood that the jury framed it in the jury room, prior to any statement from the judge.  Third, by the time the jury expressed its desire to see specific excerpts, the judge had, on three occasions, offered the option of viewing the videotapes in their entireties.  Finally, there is nothing that prevented the jury from making a subsequent request, from the security of the jury room, to see longer excerpts from the videotapes, and, indeed, the day after the jury viewed the videotapes in the courtroom, the court provided a clean computer on which it could view the videos again, at its leisure.  Under these circumstances, we do not presume prejudice resulting from the court's decision to have the jury review videotape evidence in the courtroom.

To conclude, Rodriguez has not established prejudice, and while we recognize that there may be cases involving outside

_____

[4]  The transcript demonstrates that during trial, the jury was shown only excerpts of the tapes, which reinforces the judge's understanding that the jury did not know how long they were.

-14-

influence upon jurors where prejudice should be presumed, this is not one of them. The circumstances here presented a risk of chilling the jurors' deliberations, but not a risk sufficient to support a presumption of prejudice. Because prejudice is one of the four showings necessary to establish plain error, see Batchu, 724 F.3d at 7 n.4, the district court's decision to have the jury confer in the courtroom survives plain-error review.

## II. Instructions on Inferences from Photographic Evidence

While cross-examining a cooperating witness who had purchased cocaine base from Rodriguez, defense counsel elicited testimony that, before the witness made her first contact with Rodriguez, a law-enforcement officer showed her a photographic image of him. Then, during the direct examination of a law-enforcement officer involved in the case, the following exchange took place:

> Q. Okay. Had you apprised yourself of [Rodriguez's] appearance before you began your surveillance?
>
> A. Yes. I observed photos of him prior.
>
> MR. LoCONTO: Judge, may we approach briefly?
>
> THE COURT: You may.
>
> [S]idebar as follows:
>
> MR. LoCONTO: . . . . It just occurred to me that the government's asking questions [as] if the Court would give some sort of limiting instruction . . . that they [should] draw no negative inference [from the fact]

-15-

that the police have a photograph of my client; that there may be a number of sources that he might have gotten it from. It doesn't necessarily make him –

. . . .

MR. FLASHNER: Your honor, Mr. LoConto brought out on cross-examination that the cooperating witness was shown photographs. I may or may not go into that with the case agent.

MR. LoCONTO: Judge, I know I was given a Fitchburg impact team whatever photograph, and I just want to make sure that . . . the term "impact team" –

THE COURT: You know what, I think at this point I'm not going to touch it, because frankly, I [would] just [as soon] not draw their attention to it. But . . . I will let you ask when you revisit it later, or even as an instruction.

Defense counsel did not raise the issue again, did not request a limiting instruction in the final jury charge, and did not object when no such instruction was given.

Rodriguez now argues that the district court committed plain error by failing to instruct the jury that it could not draw a negative inference from the fact that law-enforcement officers possessed photographic images of him. We disagree.

Given Rodriguez's failure to request the instruction he now faults the court for not giving, and his failure to object when such an instruction was not given, he now bears the burden of demonstrating plain error. See United States v. Guevara, 706 F.3d

-16-

38, 46 (1st Cir. 2013) (citing <u>United States</u> v. <u>Appolon</u>, 695 F.3d 44, 59-60 (1st Cir. 2012)). As we have pointed out before, "the plain error exception is cold comfort to most defendants pursuing claims of instructional error." <u>United States</u> v. <u>Mitchell</u>, 596 F.3d 18, 25 (1st Cir. 2010) (quoting <u>United States</u> v. <u>Gómez</u>, 255 F.3d 31, 37 (1st Cir. 2001)). The comfort provided by the plain-error exception is even colder where, as here, the defendant is not challenging the court's failure to give a substantive instruction relating to a defense such as entrapment, <u>see</u> <u>Guevara</u>, 706 F.3d at 46, or the buyer-seller defense to a conspiracy claim, <u>see</u> <u>Mitchell</u>, 596 F.3d at 24-25, but, rather, is challenging the court's failure to give a limiting instruction.

To arguments such as the one presented here, based upon a failure to give an unrequested limiting instruction, we have been particularly unreceptive. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Lugo Guerrero</u>, 524 F.3d 5, 14 (1st Cir. 2008); <u>United States</u> v. <u>LeMoure</u>, 474 F.3d 37, 44 (1st Cir. 2007). Indeed, "it would be most unusual for us to find that a district court erred in failing to give a limiting instruction that was never requested." <u>United States</u> v. <u>Lebrón-Cepeda</u>, 324 F.3d 52, 60 (1st Cir. 2003). That is because "[t]he district court is not required to 'act <u>sua sponte</u> to override seemingly plausible strategic choices on the part of counseled defendants.'" <u>LeMoure</u>, 474 F.3d at 44 (quoting <u>United States</u> v. <u>De La Cruz</u>, 902 F.2d 121, 124 (1st Cir. 1990)); <u>see also</u>

-17-

United States v. Cartagena-Carrasquillo, 70 F.3d 706, 713 (1st Cir. 1995) (refusing to impose obligation on district court to give, sua sponte, a limiting instruction because "[w]hether an instruction will 'cure' a problem or exacerbate it by calling more attention to it than warranted is within the ken of counsel and part of litigation strategy and judgment").

The facts of this case bring it squarely within the paradigm described in Lebrón-Cepeda, Cartagena-Carrasquillo, and De La Cruz. After first eliciting testimony about photographs the police showed the cooperating witness, Rodriguez's counsel later began to develop misgivings about presenting the jury with evidence suggesting that the police possessed photographic images of his client. He shared those preliminary misgivings with the court. In response, the court explained its own reasonable misgivings about calling attention to Rodriguez's possible previous involvement with the police by giving a contemporaneous limiting instruction. But, the court also invited Rodriguez's counsel to request that a limiting instruction be included in the jury charge. He did not do so. Because the court clearly indicated a willingness to entertain a limiting instruction, we conclude that the lack of a request for one was a strategic decision by Rodriguez's counsel, made after reflecting on the court's clearly articulated concern that such an instruction might do more harm than good. The court's decision not

to override a plausible strategic choice by Rodriguez's counsel was not plain error.

### III. Sentencing as a Career Offender

After he was convicted, Rodriguez was sentenced as a career offender, based upon determinations by the district court that Rodriguez's prior convictions were lawful. Rodriguez now argues that his sentence in this case violates the Sixth Amendment prohibition against judicial fact finding. It does not.

"[F]acts that expose a defendant to a punishment greater than that otherwise legally prescribed [are] by definition 'elements' of a separate legal offense." Apprendi v. New Jersey, 530 U.S. 466, 483 n.10 (2000). As such, those facts must be "alleged in the indictment and found by the jury." Id. However, "[i]n Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), [the Supreme Court] recognized a narrow exception to [the] general rule [stated above] for the fact of a prior conviction." Alleyne v. United States, 133 S. Ct. 2151, 2160 n.1 (2013). "In Alleyne, the Supreme Court [also] stated that Almendarez-Torres . . . remains good law." United States v. Carrigan, 724 F.3d 39, 51 n.4 (1st Cir. 2013) (citing Alleyne, 133 S. Ct. at 2160 n.1). "This being the case, we must reject [Rodriguez's] argument that his . . . Sixth Amendment rights were implicated when . . . the jury was not required to pass on [his prior convictions.]" Paladin, 748 F.3d at 452.

## IV. Conclusion

The judgment of the district court is **<u>affirmed.</u>**