# United States Court of Appeals
## For the First Circuit

---

No. 08-2056

UNITED STATES OF AMERICA,

Appellee,

v.

JASON GERHARD,

Defendant, Appellant,

---

No. 08-2300

UNITED STATES OF AMERICA,

Appellee,

v.

CIRINO GONZALEZ,

Defendant, Appellant,

---

No. 08-2450

UNITED STATES OF AMERICA,

Appellee,

v.

DANIEL RILEY,

Defendant, Appellant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. George Z. Singal, U.S. District Judge]

_____

Before

Lynch, Chief Judge,
Souter, Associate Justice,[*]
Selya, Circuit Judge.

_____

Paul M. Glickman with whom Glickman Turley LLP was on brief for appellant Jason Gerhard.
Joshua L. Gordon with whom Law Office of Joshua L. Gordon was on brief for appellant Cirino Gonzalez.
Sven D. Wiberg with whom Wiberg Law Office, PLLC was on brief for appellant Daniel Riley.
Seth R. Aframe, Assistant United States Attorney, with whom Gretchen Leah Witt, Acting United States Attorney, was on brief for appellee.

_____

July 30, 2010

_____

_____

[*]    The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**LYNCH**, **Chief Judge**.  Jason Gerhard, Cirino Gonzalez, and Daniel Riley were convicted after actively supporting two convicted criminals during a well-publicized, nine-month standoff with federal authorities, and they now appeal.

These three defendants violated several federal statutes by providing material support to Edward and Elaine Brown, who refused to surrender to face punishment following their January 2007 federal tax convictions.  The Browns defied law enforcement authorities from their Plainfield, New Hampshire, property, turning it into an armed camp.  U.S. Marshals, having learned from past experiences, were anxious to avoid a violent confrontation; eventually they peacefully apprehended the Browns in October 2007.

Defendants helped acquire firearms and explosives and turn the Browns' property into a potential death trap.  They also made statements to the media and through the Internet to the effect that any law enforcement officers who attempted to arrest the Browns would do so at their peril.  Defendants were arrested in September 2007.

Defendants were indicted in January 2008 on charges of conspiring to prevent federal officers from discharging their duties, 18 U.S.C. § 372 (Count 1), conspiring to commit offenses against the United States, id. § 371 (Count 2), and being accessories after the fact to the Browns' tax crimes, id. § 3 (Count 3).  Each defendant was also charged in an individual count

-3-

alleging possession of firearms and/or destructive devices in connection with a crime of violence, 18 U.S.C. § 924(c)(1)(A)-(B); Gerhard was charged in Count 4, Gonzalez in Count 5, and Riley in Count 6.

After a twelve-day jury trial, Gerhard and Riley were convicted on all counts against them. Gonzalez was convicted on Counts 2 and 3; the jury hung as to Count 1, the conspiracy-to-prevent charge, and Count 5, which charged him with possessing a firearm in connection with a violent crime. Those counts were dismissed on the government's motion.

Riley was sentenced to 432 months' imprisonment, five years of supervised release, and a $400 special assessment; Gerhard to 240 months' imprisonment, five years of supervised release, and a $400 special assessment; and Gonzalez to 96 months' imprisonment, three years of supervised release, and a $200 special assessment.[1]

Defendants now raise a variety of objections. We reject each of their claims and affirm.

## I. Factual Background

We describe Edward and Elaine Brown's well-publicized confrontation with federal authorities to set the stage, as well as some of each of the defendant's activities.

---

[1] The Browns were separately charged with and convicted of obstruction of justice, conspiracy, and several related offenses arising from their refusal to surrender. Their appeal is pending.

The Browns were indicted on April 5, 2006, for conspiracy to defraud the United States, 18 U.S.C. § 371, conspiracy to structure financial transactions to avoid reporting requirements, id. § 371, and aiding and abetting the structuring of financial transactions to avoid reporting requirements, 31 U.S.C. § 5324(a)(3) and 18 U.S.C. § 2. Elaine Brown was also charged with multiple counts of aiding and abetting tax evasion, 26 U.S.C. § 7201 and 18 U.S.C. § 2, and aiding and abetting the willful failure to collect employment taxes, 26 U.S.C. § 7202 and 18 U.S.C. § 2. The Browns' trial began on January 9, 2007.

On January 12, the couple failed to show up for the fourth day of trial. Edward Brown did not appear for the remainder of the proceedings, and, on January 12, the district court issued a warrant for his arrest. The U.S. Marshals Service ("USMS") convinced Elaine Brown to return for the balance of the trial; as a precaution, the district court barred her from returning to the couple's Plainfield, New Hampshire, property--where Edward Brown was known to be staying--and ordered her to wear a tracking bracelet. On January 18, the jury returned a guilty verdict against both of the Browns on all counts against them. Sentencing was scheduled for April 24, 2007.

On February 20, 2007, Elaine Brown disobeyed the court's orders by removing her tracking bracelet and joining Edward Brown at the Plainfield property. The following day, the court issued a

warrant for her arrest.  On April 24, the Browns were sentenced in absentia to 63 months' imprisonment on the tax-related charges followed by three years' supervised release.  They did not surrender to federal authorities.

The Browns publicly threatened that any efforts to arrest them on their Plainfield property would be met with lethal force. Beginning on January 12, a cadre of supporters, some of them armed, joined Edward Brown on the couple's property.  Edward Brown invoked the specter of past violent confrontations with federal law enforcement personnel in Ruby Ridge, Idaho,[2] and Waco, Texas, should federal authorities try to take the Browns into custody.  He held widely reported press conferences, gave statements to the media, and contributed to Internet broadcasts in which he warned that anyone who attempted to imprison him or his wife would be killed.  He also made threats against the lives of officers and elected officials, as well as their families.  Elaine Brown insisted that the couple would either leave their property free or in body bags.

---

[2]    Randy Weaver, whose 1992 standoff with federal authorities at Ruby Ridge resulted in multiple deaths, see Idaho v. Horiuchi, 215 F.3d 986, 988-91 (9th Cir. 2000), vacated as moot by Idaho v. Horiuchi, 266 F.3d 979 (9th Cir. 2001), eventually joined the Browns on their property for some portion of the standoff.

Attracted by these statements, television, print, and electronic media set up shop in Plainfield to report on the standoff.

The USMS, determined to avoid a violent confrontation, "went to extraordinary lengths to insure that [the standoff] would be resolved peacefully without people being injured or killed." As New Hampshire's U.S. Marshal testified at the defendants' trial:

> [A]lmost immediately [Edward Brown] started talking about violence, using violence towards law enforcement if we attempted to go to his house. He talked about Waco and Ruby Ridge. There were supporters there. We knew there were weapons there. So we made a conscious decision in January to proceed in a very deliberate and methodical way to find the best means and the best opportunity to take them safely into custody so that no one got hurt.

From January until mid-June 2007, deputy marshals spoke regularly to the Browns on the telephone, urging them to surrender. The U.S. Marshal also sent the Browns two letters, describing their legal situation and asking them to give themselves up to authorities.

During this period, the USMS did not attempt to enter the Browns' residence, which sat in the middle of their hundred-acre property and had a "very difficult approach." The USMS began surveillance of the Browns' property in January but carefully avoided encounters with the Browns or their supporters that could have resulted in violence.

Until September 2007, the USMS allowed individuals other than the Browns to enter and exit the property. The USMS hoped

this would give them an opportunity to insert undercover deputy marshals and resolve the situation peacefully. The USMS also repeatedly warned the public against giving certain forms of aid to the Browns. The USMS made statements, through the media, "that the Browns were convicted felons, they were resisting government efforts to get them to surrender, that [USMS officers] were aware that they had weapons at their home, that supporters were going there," and that "if you aid or abet the Browns, you bring them weapons or supplies or aid them in their effort to obstruct justice, that you could be subjecting yourself to arrest and prosecution."

Despite the USMS's warnings, all three defendants went to New Hampshire to support the Browns after the couple's convictions. Jason Gerhard, then twenty-one years old, from Brookhaven, New York, traveled to the Browns' property several times between February and August of 2007 and lived there for "a while" during this period; Daniel Riley, then thirty-nine years old, from Cohoes, New York, was a regular visitor between March and September 2007; and Cirino Gonzalez, then thirty years old, from Alice, Texas, stayed often with the Browns from early April until late June.

Each of the three defendants came to the New Hampshire property anticipating violence and brought at least one weapon with him to the Browns' home. After assessing the situation firsthand, the defendants each helped prepare the Plainfield property to

withstand attempts by the USMS to arrest the Browns. The three worked together to help the couple acquire additional firearms, ammunition, and explosive devices, some of which they placed strategically around the property. Their efforts diminished prospects for a peaceful resolution to the standoff and delayed apprehension of the Browns.

When acquiring and stockpiling weapons for the Browns, the defendants often cooperated closely with each other. For instance, on May 17, 2007, Riley e-mailed Gonzalez to coordinate the purchase of two .50 caliber rifles, capable of firing armor-piercing rounds and equipped with specialized scopes for long-distance shooting. Riley said that Gonzalez would "only need one for the house." The next day, Riley arranged to meet Gonzalez at a gun shop in Newport, New Hampshire, to fill out necessary paperwork to acquire the guns. On May 23, Gonzalez and Riley met at a Newport gun dealer, where each purchased a .50 caliber rifle. Riley later e-mailed Gonzalez to ask if Edward Brown was "happy with our progress," if Brown wanted additional "rounds" of ammunition, and if the supporters in Plainfield had rifles. Two days after Riley's query about riles, Gonzalez returned to Newport to pick up his .50 caliber rifle. Gerhard also purchased a half-dozen firearms for the Browns' resistance, most of which were found on the Browns' property after their arrest.

The defendants invested considerable effort in publicizing their efforts to arm the Browns' stronghold against the USMS. They communicated their support of the Browns through e-mails, online videos, and radio interviews, in which each asserted his willingness to use deadly force to protect the couple from apprehension. The USMS's knowledge that armed supporters of the Browns were on the property was a factor the USMS considered when delaying entering the Browns' property to apprehend the couple during the first four months of the standoff.

The USMS's efforts went through several stages as events played out. In the early morning of June 7, 2007, the USMS deployed two teams of about fifty officers, including New Hampshire state troopers, in an effort to arrest Edward Brown whom, it was thought, would be found at the end of his driveway. A Special Operations Group ("SOG") was formed to oversee the operation, which included deputy U.S. Marshals from other districts. Armored vehicles were dispatched to the area, a medical helicopter was placed on alert, and aerial surveillance was conducted to determine how many supporters were on the Browns' property. SOG leaders set up to monitor the raid at a command post in Lebanon, New Hampshire.

The raid was called off, however, after Riley chanced upon the deputy marshals while walking a dog. Riley was briefly detained; he returned to the Browns' property soon after his release. Following that attempt, the USMS increased its pressure

on the Browns to surrender by cutting off electricity and mail delivery to the Browns' property.

In the days after the USMS's June 7 operation, defendants redoubled their efforts to fortify the Browns' property against any entry by law enforcement and to arm themselves and others for a bloody confrontation in the event the USMS attempted to take the couple into custody. On June 8, 2009, Gerhard purchased 6,000 rounds of ammunition. The next day, Gerhard bought necessary ingredients for manufacturing pipe bombs. The pipe bombs consisted of cylinders of pipe filled with explosive powder, with space for a fuse to be inserted; twenty-one pipe bombs were found on the Browns' property after they were arrested.

Pipe bombs were not the only explosives the defendants helped manufacture. Riley assisted in the construction of deadly "one pound hand grenade[s]" consisting of nails taped to cans of gunpowder with fuses inserted; the nails were intended as shrapnel to increase the destructive force of the explosion. Working with Edward Brown, Riley also built several spring-loaded "zip guns," which were designed to fire 12-gauge shells with great accuracy at anyone who broke a trip wire. Finally, Riley obtained "highly explosive" chemicals, which he and Edward Brown used to make a series of one-pound bombs. Riley then positioned these bombs "around the perimeter of the Browns' property."

In the meantime, the Browns' resistance continued to draw media attention and supporters. In late June and July, the couple hosted two "support Ed and Elaine Brown rall[ies]" on their property. These planned events featured live music, as well as remarks by Randy Weaver, and attracted many supporters.

By September 2007, the USMS had developed a new strategy to apprehend the Browns. On September 12, deputy marshals arrested all three defendants while each was away from the Plainfield property. The Browns held press conferences in which they discussed defendants' arrests. Three days later, the USMS barred supporters from entering the Browns' property. Having successfully isolated the Browns from some of their supporters, whose presence had helped to deter arrest efforts, the USMS deployed agents, who entered the property and arrested both Browns without incident on October 4, 2007.

In addition to the explosives described above, federal officers found seventeen firearms and about 40,000 rounds of ammunition on the Browns' property after the couple's arrest.

A.      Jason Gerhard

Gerhard first met Edward Brown when Brown agreed to Gerhard's request for an interview for Gerhard's college newspaper. The interview took place on the Plainfield property on February 18 and 19, after the Browns' conviction and more than one month after Edward Brown became a fugitive. Gerhard wrote two articles based

-12-

on his conversations with Brown, which appeared on March 7, 2007, denounced the couple's "sham" trial and conviction, and detailed the atmosphere at the Browns' property. Gerhard also reported that he had traveled from New York to New Hampshire with a rifle in his trunk, which he hoped "would provide enough cover fire to get the hell out of there."

While staying with the Browns, Gerhard expected a violent confrontation with law enforcement and prepared accordingly by helping the couple secure weapons and fortify their property against any attempts by the USMS to apprehend them. Gerhard bought six guns from New Hampshire firearm dealers, four of which were found at the Browns' home after their arrest. He also purchased thousands of rounds of ammunition, as well as ingredients to manufacture pipe bombs. In addition, Gerhard performed household errands for the Browns.

Gerhard publicized his support for the Browns and his anticipation of impending armed conflict with federal authorities. He sent an e-mail to a group list, in which he made the threat "from firsthand knowledge" that "if the feds choose to come into the [Browns'] house, it would cause them a lot of pain." He added that "[Edward] Brown let's [sic] us shoot on his property, which is always good." On June 18, he sent a message to the same group, saying, "Some of us believe that it is better to lie in wait and

come with surprise at the right time. This sort of thinking does make sense, yet how long can people wait?"

Gerhard made similar threats to law enforcement officials in person. On July 17, 2007, Gerhard was involved in a traffic accident in Lebanon, New Hampshire, while driving Elaine Brown's car. When summoned to the scene, deputy U.S. Marshals impounded Brown's vehicle. The next day, Gerhard went to the Lebanon Police Department to complain and encountered several deputy marshals. A "very agitated" Gerhard told the deputy marshals that they "had no right to be there" and were enforcing "unconstitutional" laws. In response to Gerhard's assertion that Edward Brown was a "patriot," one of the marshals asked how he could consider Brown a "patriot" after the threats Brown had made against law enforcement officers and their families. Gerhard replied that the officers "were not following the Constitution" and "were now enemies of the Constitution, which was treason, and the penalty for treason was death."

Gerhard also admitted his efforts to arm the Browns. On July 20, 2007, a New Hampshire state trooper pulled Gerhard over for speeding in Charlestown, New Hampshire. The officer noticed a rifle in Gerhard's rear seat; Gerhard explained that he had just purchased it and that he was returning to the Browns' property, where he had been staying.

On September 12, 2007, a deputy marshal and local police arrested Gerhard, who had enlisted in the U.S. Army, at Fort Leonard Wood U.S. Army Base in Missouri.

B.      Cirino Gonzalez

Gonzalez learned about the Browns' activities in late January 2007, considered the circumstances similar to protests at Ruby Ridge and Waco, and decided to support the Browns.  In early April, Gonzalez packed some belongings, including a handgun and a semiautomatic rifle, and drove from Texas to the Browns' Plainfield, New Hampshire, property.  He stayed with the Browns in Plainfield for about two-and-a-half months.

During his stay, Gonzalez served, in his own words, as "volunteer security" for both Browns.  In that capacity, he routinely carried at least one firearm.  At one meeting in the Browns' home, Gonzalez was observed standing behind the couple, wearing a holstered handgun.  As part of a video prepared by Brown sympathizers and made available to the public, Gonzalez was recorded standing next to Randy Weaver on the Browns' porch with a rifle slung over his shoulder.  Aerial surveillance by the USMS on the morning of the failed June raid showed Gonzalez walking several feet behind Edward Brown with a rifle over his shoulder as the two searched for Riley.

In addition to providing personal security, Gonzalez helped further stock the Browns' arsenal.  As described above, he

collaborated with Riley to purchase a .50 caliber rifle, which he later brought to the Browns' residence and kept next to his bed. Gonzalez also managed a website which publicized the Browns' actions.

At some point after the USMS's failed June raid, Gonzalez gave a video-recorded interview to a "We The People Radio Network" correspondent named "King Mob" from the Browns' property. Gonzalez declared,

> The only reason why [federal law enforcement] haven't rolled in here is because they know they have people that have been trained by their own military and by their own law enforcement that are here now literally . . . and they know how to use the weapons they have been given . . . . We have weapons and we are going to defend ourselves because we actually know what's going on.

Gonzalez wore a shoulder holster throughout the interview. The video was made available to the public online.

Gonzalez left Plainfield in late June. Gonzalez continued to communicate with Riley, and he received several updates about events unfolding on the Browns' property. U.S. Marshals arrested Gonzalez in Alice, Texas, on September 12, 2007. Gonzalez was the only defendant to testify at trial.

C.    Daniel Riley

Daniel Riley learned of Edward and Elaine Brown's "problems" with federal law enforcement in February 2007. Between March and September of that year, he traveled repeatedly from his

-16-

home in Cohoes, New York, to the Browns' Plainfield property and was described as the Browns' "very good friend."

Riley posted an Internet video on March 2, 2007, expressing support for the Browns' "revolution" against the "thieving international bankers" who "control [the U.S.] government and are out to destroy [the] country." Riley pledged to give the couple a "few things" to aid in their resistance. As he had pledged, Riley brought a 12-gauge shotgun and other weapons with him to the Plainfield property.

As the standoff continued, Riley helped get firearms and explosives for the Browns in anticipation of a violent struggle with law enforcement. Riley coordinated his and Gonzalez's May purchase of two rifles and instructed Gonzalez that only one of the weapons would be needed "for the house." Riley asked Gonzalez if Edward Brown wanted more ammunition. Riley also manufactured a series of explosive booby traps, some of which he personally deployed around the Browns' property.

Riley attempted to persuade Gonzalez to return to the Browns' property. On July 20, about a month after Gonzalez had returned to Texas, Riley e-mailed him, urging, "We have a war to win and we need everybody."

Riley repeatedly expressed his willingness to use lethal force to protect the Browns. On July 28, Riley e-mailed several individuals, including Gonzalez, to report that everyone on the

-17-

property was "at battle stations" after hearing noises in the woods. The next day, again believing that the marshals were preparing to arrest the Browns, Riley called into a radio show from inside the Browns' home and informed listeners that supporters were on "high alert," had their guns "unchambered," and were prepared to go "toe to toe" with the USMS to resist "tyranny" and protect the Browns. Riley sent another e-mail in August 2007 in which he stated that "the number one most important thing" the Browns needed was "people to come and stand to their death, if necessary, to save our country . . . , but no homos, lol."

U.S. Marshals arrested Riley in Cohoes on September 12, 2007. A search of his residence revealed a rifle signed by Edward Brown and Randy Weaver.

## II. Defendants' Arguments on Appeal

On appeal, the defendants challenge the indictment, the trial, and their sentences. We reject each of their arguments and affirm.

### A. Arguments Related to the Indictment

The defendants raise three distinct challenges to the indictment. First, Gerhard and Riley assert that the offenses alleged in Count 1, 18 U.S.C. § 372, and Count 2A, id. §§ 371 and 111(a), on which they were convicted, are multiplicitous. Second, Gerhard claims that the crimes charged in Count 1, Count 2B, id. §§ 371 and 3, and Count 3, id. § 3, are also multiplicitous.

-18-

Finally, all three defendants argue the indictment insufficiently alleged the Browns' original offenses of conviction underlying the defendants' convictions on Count 3 as accessories after the fact. We reject all three claims.

1.       Gerhard and Riley's Separate Convictions under 18 U.S.C. § 372 and 18 U.S.C. §§ 371 and 111(a) Are Not on Multiplicitous Counts

Gerhard and Riley argue that their convictions under 18 U.S.C. § 372 (Count 1) and 18 U.S.C. §§ 371 and 111(a) (Count 2A) constituted multiple punishment for the same offense, in violation of the Double Jeopardy Clause, U.S. Const. amend. V.  Their claim was properly raised before the district court, so our review is de novo.  E.g., United States v. Lanoue, 137 F.3d 656, 661 (1st Cir. 1998).

Defendants may be subjected to multiple punishment for the same conduct under more than one statute so long as the legislature intended to create separate offenses. United States v. LeMoure, 474 F.3d 37, 43 (1st Cir. 2007) (citing Missouri v. Hunter, 459 U.S. 359, 365 (1983)).  Under the judicially created analysis for discerning legislative intent, we examine whether each offense "requires proof of an additional fact which the other does not." Blockburger v. United States, 284 U.S. 299, 304 (1932); see also United States v. Nascimento, 491 F.3d 25, 48 (1st Cir. 2007). The conduct described in one offense must necessarily include the conduct of the second offense to result in a double jeopardy

-19-

violation.  See, e.g., Ball v. United States, 470 U.S. 856, 862 (1985).

In fact, the two charges at issue reach conduct that is not necessarily the same, and, to the extent that the charges apply to overlapping conduct, Congress intended to create separate offenses.  Congress chose language that clearly demonstrates that these two offenses are distinct and that one is not a lesser included offense of the other.  No double jeopardy problem arises.

These statutes have two separate foci.  Congress intended the pertinent portion of § 372 to criminalize conspiracy to prevent a U.S. officer from discharging his duties.  By contrast, the conspiracies charged in §§ 371 and 111(a) are focused, not on prevention from discharge of duties, but on conspiracies to interfere with an officer while in the performance of his duties.  That intent is evident from the texts of § 372 and § 111 and is reinforced by the provisions' legislative histories.

We begin with the text of the statutes in the two charges.  Section 372, Count 1, makes it criminal for

> two or more persons in any State, Territory, Possession, or District [to] conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof, or to induce by like means any officer of the United States to leave the place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to

-20-

> injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties.

18 U.S.C. § 372. Defendants were charged under only that portion of the statute criminalizing conspiracy "to prevent, by force, intimidation, or threat, any person from . . . from discharging any duties" as an officer of the United States.

As for the other charge, Count 2A, a conspiracy to violate § 111(a), we read § 371 and § 111(a) together because together they define the crime. Section 371, the general conspiracy statute, creates criminal liability, inter alia, for "two or more persons [who] conspire . . . to commit any offense against the United States," provided "one or more of such persons do any act to effect the object of the conspiracy." Id. § 371. Section 111(a) proscribes "forcibly assault[ing], resist[ing], oppos[ing], imped[ing], intimidat[ing], or interfer[ing] with a [United States Officer] while engaged in or on account of the performance of official duties." Id. § 111(a).

The question of whether Count 2A requires proof of facts not required under Count 1 is easily answered. The offense charged under §§ 371 and 111(a) requires proof of at least two facts that § 372 does not: (1) that defendants conspired to use force and (2) that at least one of them acted to achieve the object of the conspiracy.

The defendants' more serious argument turns on whether the reverse is also true: whether § 372, charged in Count 1, requires proof of at least one fact that §§ 371 and 111(a), charged in Count 2A, does not.

Defendants concede that § 372 is concerned with conspiracy to "prevent" an officer from discharging his duty, whereas §§ 371 and 111(a) address conspiracy to "resist[], oppose[], impede[], or interfere[]" with an officer presently engaged in fulfilling his duties. They urge that the words "to prevent . . . from" in § 372 are, "[f]or all intents and purposes," synonymous with the terms used in § 111(a), as charged under § 371. In essence, they argue the phrase "to prevent . . . from discharging" the duties of his office, 18 U.S.C. § 372, means the same as to "impede[] . . . while engaged in or on account of the performance of official duties," id. § 111(a).

The government responds that the statutes address different time frames. It asserts that "prevent" should be given its common meaning, "to keep from happening." Merriam Webster's Collegiate Dictionary 924 (10th ed. 1993). The common meaning of a term is a useful indication of intent. See, e.g., Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383 (1992); see also SEC v. Tambone, 597 F.3d 436, 442-43 (1st Cir. 2010) (en banc). Under the government's construction, § 372 requires proof of intent to keep a federal officer from beginning performance of his duty by

preventing the discharge of the duty. By contrast, the plain language of §§ 371 and 111(a) mandates a showing that defendants conspired to disrupt a federal officer while presently engaged in the discharge of his duty or on account of his duties.

There is no double jeopardy problem for several different reasons. First, § 372 itself makes clear that to prevent an officer from performing his duty is not the same as impeding an officer in the performance of his duty. Different facts are required for conviction under § 372 than are required under §§ 111(a) and 371. The common meaning of "to prevent . . . from" is future oriented, not present oriented. Second, § 111's enactment history shows that Congress felt the existing protection under § 372 was insufficient and that it needed to enact § 111. Third, Congress retained § 372 after it enacted the general conspiracy statute, demonstrating that it intended § 372 to reach different conduct than §§ 371 and 111.

The charge in the indictment Count 1 under § 372 quoted only one clause of several in the statute, each of which defines a discrete crime. The balance of § 372's text gives context to congressional intent as to the meaning of "to prevent."[3] See Mullane v. Chambers, 333 F.3d 322, 330 (1st Cir. 2003) (noting that statutory language must be defined with "reference to the 'specific

---

[3] Indeed, we have, in a different context, defined "prevent" more broadly than we do here. See Wood v. Spencer, 487 F.3d 1, 7 (1st Cir. 2007).

context in which that language is used, and the broader context of the statute as a whole'" (quoting <u>Robinson</u> v. <u>Shell Oil Co.</u>, 519 U.S. 337, 341 (1997))); <u>see also United States</u> v. <u>Jimenez</u>, 507 F.3d 13, 19 (1st Cir. 2007).  In this context, Congress intended the words "to prevent . . . from" to have a different meaning than that argued by the defendants.

Several additional clauses of § 372 reveal two points. First, Congress did not equate "to prevent . . . from" discharging duties with "impede" or "hinder" in the discharge of duties. Second, Congress drew temporal distinctions between different opportunities to disrupt federal officers performing their duties, which again give "prevent" a different meaning than to "impede." We must give significance to Congress's choice of words.  <u>See, e.g.</u>, <u>Smith</u> v. <u>United States</u>, 508 U.S. 223, 229 (1993).

In the other clauses following the use of "prevent," Congress used words such as "molest, interrupt, hinder, or impede" in the discharging of the officer's duties. 18 U.S.C. § 372.  This shows that "prevent . . . from" was meant to denote conduct different from "molest[ing], interrupt[ing], hinder[ing], or imped[ing] . . . in." <u>See United States</u> v. <u>Ahlers</u>, 305 F.3d 54, 59-60 (1st Cir. 2002) (noting that "when Congress uses certain words in one part of a statute, but omits them in another," we "presume that this differential draftsmanship was deliberate").

Further, 18 U.S.C. § 372 recognizes a series of temporal distinctions. The clause under which defendants were charged addresses preventing officials from accepting or holding federal office or from discharging their duties. Id. The next clause addresses inducing officers to leave the place where duties are to be performed. Id. Another clause addresses injuring an officer "on account of . . . or while engaged in" discharging of his duties. Id. A final clause addresses injuring the officer's property "so as to molest, interrupt, hinder, or impede him in the discharge of his . . . duties." Id. Together, these clauses cover a range of time frames before, during, and after the assumption and execution of the responsibilities of federal office. See Carr v. United States, 130 S. Ct. 2229, 2236 (2010) ("Congress' use of a verb tense is significant in construing statutes." (quoting United States v. Wilson, 503 U.S. 329, 333 (1992) (internal quotation marks omitted))).

These distinctions demonstrate that the terms "molest," "interrupt," "hinder," and "impede" are not synonymous with the term "prevent." Instead, "prevent" describes conspiracies to disrupt an officer's duties before the officer begins to discharge them. Not only is this construction consistent with the ordinary meaning of the word prevent, Merriam Webster's Collegiate Dictionary, supra, at 924, it is also amply supported by the

statutory context in which the word appears, see Mullane, 333 F.3d at 330.

Second, the legislative histories of both § 372 and § 111 reinforce our construction. Section 372, the oldest of the pertinent statutes, was originally enacted in 1861 and has remained essentially unchanged since.[4] See H.R. Rep. No. 80-304 (1947), reprinted in 1948 U.S.C.C.A.N. 2477. The predecessor to § 111 was adopted in 1934, at the urging of the U.S. Attorney General. United States v. Feola, 420 U.S. 671, 681 & n.16 (1975). Later, Congress substantially revised existing conspiracy laws, eliminating numerous "special conspiracy" provisions and adopting § 371. H.R. Rep. No. 80-304, reprinted in 1948 U.S.C.C.A.N. 2475, 2476. Section 372 was one of just ten special conspiracy laws that survived this consolidation. Id. A reason Congress retained the ten, including § 372, was to preserve the greater punishment attached to them. Id.

Significantly, the adoption of § 111's predecessor reflected Congress's determination that the existing, piecemeal statutory scheme--including § 372--was insufficient to protect federal officers' discharge of their duties. See Feola, 420 U.S.

---

[4] Section 372 has been amended twice to expand the scope of its jurisdiction: once in 1909 to include "District[s]" and again in 1948 to include "Possession[s]." H.R. Rep. No. 80-304 (1948), reprinted in 1948 U.S.C.C.A.N. 2477. It was also amended in 2002 to remove a $5,000 cap on fines for violations of the statute, Criminal Law Technical Amendments Act of 2002, Pub. L. No. 107-273, § 4002(d)(1)(D), 116 Stat. 1759, 1861 (2002).

at 680 n.16 (quoting a letter from the U.S. Attorney General that appeared in the statute's legislative history, which urged that "[t]he need for general legislation . . . for the protection of Federal officers and employees other than those specifically embraced in [existing] statutes . . . becomes increasingly apparent every day"); see also id. at 681 ("Congress clearly was concerned with the safety of federal officers insofar as it was tied to the efficacy of law enforcement activities."). Thus, § 111 must be seen as not having an identical meaning to § 372.

Third, with § 111 on the books, the 1948 enactment of § 371 gave federal authorities a further tool: a general conspiracy statute for prosecuting individuals who conspired to violate § 111. And yet Congress deliberately retained § 372,[5] a fact that bolsters our conclusion that Congress intended § 372 to reach conduct under the "to prevent . . . from" clause distinct from that which could be prosecuted under §§ 371 and 111.

To the extent that defendants urge us to invoke the rule of lenity, see, e.g., Heflin v. United States, 358 U.S. 415, 419 (1959), their reliance on the rule is misplaced. "[T]he rule of lenity only applies if, after considering text, structure, history,

---

[5] The pertinent House Report explains that special conspiracy statutes were retained "(1) where the conspiracy would constitute the only offense, or (2) where the punishment provided in this section would not be commensurate with the gravity of the offense." H.R. Rep. No. 80-304 (1947), reprinted in 1948 U.S.C.C.A.N. 2475, 2476.

and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended."  Barber v. Thomas, 130 S. Ct. 2499, 2508-09 (2010) (citations omitted) (internal quotation marks omitted).

Indeed, the rule of lenity is founded in significant part "on the plain principle that the power of punishment is vested in the legislative, not in the judicial department."  United States v. Wiltberger, 18 U.S. (5 Wheat.) 76, 95 (1820) (Marshall, C.J.); see also id. ("It is the legislature, not the Court, which is to define a crime, and ordain its punishment.").  Where the legislature has clearly defined the crime and punishment, there is no room for the judicially crafted rule of lenity.  In light of the "text, structure, history, and purpose" of the statutes at issue, we perceive no ambiguity in Congress's intent.

2.    Gerhard's Convictions under 18 U.S.C. § 372, 18 U.S.C. §§ 371 and 3, and 18 U.S.C. § 3 Are Not Multiplicitous

Gerhard makes a separate, undeveloped argument that his convictions under 18 U.S.C. § 372 (Count 1), 18 U.S.C. §§ 371 and 3 (Count 2B) (conspiracy to be an accessory after the fact), and 18 U.S.C. § 3 (Count 3) (being an accessory after the fact) are multiplicitous.  Gerhard did not argue this point to the district court, so we review it for plain error.  E.g., United States v. Patel, 370 F.3d 108, 115 (1st Cir. 2004).  The four-part test for plain error review requires Gerhard to show:

-28-

> (1) there is an "error;" (2) the error is "clear or obvious, rather than subject to reasonable dispute;" (3) the error "affected the appellant's substantial rights, which in the ordinary case means" it "affected the outcome of the district court proceedings;" and (4) "the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."

United States v. Marcus, 130 S. Ct. 2159, 2164 (2010) (alteration in original) (quoting Puckett v. United States, 129 S. Ct. 1423, 1429 (2009)); see also United States v. Moran, 393 F.3d 1, 13 (1st Cir. 2004).

Under any standard, Gerhard's claim is meritless. Counts 1, 2B, and 3 each mandate evidence of facts the others do not. Blockburger, 284 U.S. at 304; see also United States v. Gomez-Ruiz, 931 F.2d 977, 979-80 (1st Cir. 1991) (comparing multiple statutes).

We begin by comparing Counts 1 and 3. The facts required for conviction under these counts are obviously distinct. Count 3, which charged a violation of 18 U.S.C. § 3, the accessory-after-the-fact statute, mandated proof that a defendant "knowing that an offense against the United States ha[d] been committed, receive[d], relieve[d], comfort[d] or assist[ed] the offender in order to hinder or prevent his apprehension, trial or punishment." Id. Count 1 did not. Id. § 372. And Count 1 required proof, unlike Count 3, that the defendant conspired to prevent a federal officer from performing his duty. Id.

Count 1 was also not multiplicitous with Count 2B, which alleged a conspiracy to violate § 3. Unlike Count 1, Count 2B

-29-

demanded proof of an overt act to effect the object of the conspiracy and evidence that the conspirators sought to violate § 3. 18 U.S.C. §§ 371 and 3. Count 1, as stated, required proof of entirely different conduct. Id. § 372.

Finally, despite any superficial similarity, Count 2B (conspiracy to be an accessory after the fact) and Count 3 (being an accessory after the fact) are also not multiplicitous. "[I]t has long been established that conspiracy to commit a crime is not the same offense as the substantive crime for double jeopardy purposes because the agreement to do the act is distinct from the [completed] act itself." United States v. Fornia-Castillo, 408 F.3d 52, 69 (1st Cir. 2005) (alteration in original) (internal quotation marks and citation omitted).

3.      The Indictment Adequately Alleged the Federal Crimes Committed by the Browns

All three defendants claim that the accessory counts in the indictment are defective because Counts 2B and 3 stated only that the defendants,

> knowing that offenses against the United States had been committed by Edward Brown and Elaine Brown, received, relieved, comforted and assisted Edward Brown and Elaine Brown in order to hinder and prevent their apprehension, trial and punishment.

Counts 2B and 3 also incorporated earlier paragraphs, which alleged (1) that a jury had returned verdicts on January 18, 2007, "convicting Edward Brown and Elaine Brown of conspiracy and a number of federal tax crimes;" (2) that a federal warrant was

issued against Edward Brown on January 12, 2007, when he failed to appear for the completion of his trial; (3) that a federal arrest warrant was issued for Elaine Brown's arrest postconviction when she violated the conditions of her release pending sentencing; (4) that on April 24, 2007, the Browns were sentenced to 63 months in prison; and (5) that while the Browns were fugitives, the USMS made efforts to arrest them.

The defendants claim that the indictment was insufficient because it did not name or otherwise specifically identify the Browns' offenses of conviction.[6]  None of the defendants raised this objection to the trial court, so appellate review is for plain error.  United States v. Stein, 233 F.3d 6, 22-23 (1st Cir. 2000).  The defendants' argument is misplaced.

The initial issue is whether the indictment gave the three defendants adequate notice of the charges they faced, the elements of the crimes they allegedly committed, and sufficient information for double jeopardy purposes.  Hamling v. United States, 418 U.S. 87, 117-18 (1974); see also Russell v. United States, 369 U.S. 749, 767-69 (1962); United States v. Cianci, 378 F.3d 71, 80 (1st Cir. 2004).  The accessory-after-the-fact statute,

---

[6]    It is unclear if they are arguing that the indictment was defective because it did not supply citations to the U.S. Code.  If so, defendants' argument turns on its head the usual rule that statutory citations cannot normally supply a missing element in an indictment.  See United States v. McLennan, 672 F.2d 239, 243 (1st Cir. 1982).

18 U.S.C. § 3, makes it a crime for a defendant, "knowing that an offense against the United States has been committed, [to] receive[], relieve[], comfort[] or assist[] the offender in order to hinder or prevent his apprehension, trial or punishment." Id.

Here, the fact that the indictment charged that the Browns were convicted of conspiracy and tax crimes establishes adequate notice to defendants that "an offense against the United States ha[d] been committed." The government gave notice to defendants it intended to prove that they had knowledge that the Browns had been convicted of tax crimes and conspiracy and that, with that knowledge, defendants assisted the Browns to hinder or prevent the Browns' apprehension or punishment. All the necessary elements of § 3 were charged, and the defendants had sufficient notice of the charges against them for double jeopardy purposes. Under these circumstances,[7] no more was needed.[8]

---

[7] We need not address the entirely different situation of a defendant's assistance to an offender in the period preceding conviction. Those circumstances could raise questions regarding the adequacy of notice to a defendant of what underlying offense the defendant was supposedly an accessory to. In that situation, the defendant could argue he must have fair notice of the elements of the underlying offense he allegedly aided to be sure he has the requisite knowledge. See, e.g., United States v. Graves, 143 F.3d 1185, 1190 (9th Cir. 1998).

[8] If Gerhard and Gonzalez intended to raise an additional argument under Apprendi v. New Jersey, 530 U.S. 466 (2000), their claim "lacks sufficient developed argumentation and is therefore waived." United States v. Gonzalez-Melendez, 594 F.3d 28, 34 (1st Cir. 2010).

-32-

Finally, for the first time on appeal, Gerhard and Riley appear to argue that the accessory statute cannot apply to conduct that occurred after the Browns' conviction.  The plain text of the statute here reaches conduct that assists a postconviction offender to avoid apprehension or punishment.  18 U.S.C. § 3.  They have no claim.  Seahorse Marine Supplies, Inc. v. P.R. Sun Oil Co., 295 F.3d 68, 75 (1st Cir. 2002) ("[W]hen a statute's text is encompassing, clear on its face, and productive of a plausible result, it is unnecessary to search for a different, contradictory meaning . . . .").

### B. Arguments Related to the Trial

Defendants' objections to their trial fall into five general categories: (1) a frivolous challenge by Riley and Gonzalez to federal jurisdiction over their crimes, (2) arguments by Riley pertaining to his representation, (3) additional claims by Riley, (4) arguments by all three defendants contesting the jury instructions and the verdict form, and (5) Gerhard and Gonzalez's assertion that the evidence was insufficient to support their convictions on Counts 2B and 3.  Each of defendants' trial claims, which we address in roughly chronological order, lacks merit.

1.  The United States Had "Territorial Jurisdiction" to Prosecute Defendants

Riley, joined by Gonzalez, makes an argument that by any objective measure could not have been advanced in good faith nor advanced consistently with the obligations of counsel to the court.

See, e.g., Smith v. Robbins, 528 U.S. 259, 272 (2000) ("[A]n attorney is under an ethical obligation to refuse to prosecute a frivolous appeal." (internal quotation marks omitted)); see also Pimentel v. Jacobsen Fishing Co., Inc., 102 F.3d 638, 640 (1st Cir. 1996) ("An appeal is frivolous if the . . . arguments are wholly without merit." (internal quotation marks omitted)).

They primarily argue that only New Hampshire, and not the United States, has jurisdiction to prosecute crimes occurring in Plainfield, New Hampshire. They also argue that there is no venue in a federal courthouse in Concord, New Hampshire. Their theory is that either the United States must buy the land on which the offense occurred or the land must have been ceded by New Hampshire to the federal government for federal criminal laws to attach. Defendants' murky and confused argument seems to posit that this federal prosecution entails a violation of the sovereignty of the state of New Hampshire and that these defendants may assert whatever sovereign rights New Hampshire has. The claim is utterly frivolous and has been rejected before by this court and others.[9]

---

[9] Defendants, who were not themselves convicted of tax evasion, seem to have modeled their argument on "the hackneyed tax protester refrain that federal criminal jurisdiction only extends to the District of Columbia, United States territorial possessions and ceded territories." United States v. Collins, 920 F.2d 619, 629 (10th Cir. 1990) (collecting cases). Those arguments have been sanctioned as frivolous, e.g., id. at 623, 633-34, and are no less so when made in the context of this case.

-34-

See, e.g., United States v. Lussier, 929 F.2d 25, 27 (1st Cir. 1991).

The argument ignores the fact that New Hampshire chose to enter into a national union governed by the Constitution. In United States v. Worrall, 2 U.S. (2 Dall.) 384 (1798), the Supreme Court affirmed that the enumerated powers granted to Congress in Article I, § 8, included the general power "to create, define, and punish, crimes and offences, whenever they shall deem it necessary and proper by law to do so, for effectuating the objects of the [federal] government." Id. at 394; see also United States v. Comstock, 130 S. Ct. 1949, 1957-58 (2010) (noting that the Constitution "grants Congress broad authority" to create federal crimes, which Congress "routinely exercises," and collecting examples).

There is no offense to state sovereignty by this federal prosecution, nor has New Hampshire claimed that there is. In fact, New Hampshire deployed its own law enforcement to help federal authorities arrest the Browns. It is black-letter law that an act defined as a crime by both national and state sovereignties is "an offense against the peace and dignity of both and may be punished by each." United States v. Lanza, 260 U.S. 377, 382 (1922). This dual-sovereignty doctrine allows for a federal prosecution even after a prior state prosecution for the same conduct. E.g., Abbate v. United States, 359 U.S. 187, 195-96 (1959).

-35-

Congress has chosen to vest jurisdiction and venue over federal crimes in the federal courts. Congress has given the U.S. district courts exclusive original jurisdiction over all offenses against the laws of the United States. 18 U.S.C. § 3231. That jurisdiction is not limited to crimes which occur on federally owned property, nor is a state's permission needed for federal prosecution. See United States v. Hamilton, 263 F.3d 645, 655 (6th Cir. 2001); United States v. Sitton, 968 F.2d 947, 953 (9th Cir. 1992), abrogated on other grounds by Koon v. United States, 518 U.S. 81 (1996); see also Cantrell v. Reno, 36 F. App'x 651, 652 (1st Cir. 2002).

Defendants' argument depends upon severely misreading the text of the U.S. Constitution. Defendants point to clause 17 of Article I, § 8, the Exclusive Legislation Clause, which vests Congress with the power

> [t]o exercise exclusive Legislation in all Cases . . . . and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.

Id. The argument misses the point that the United States has not claimed it has the exclusive right to promulgate laws over the lands where the crimes were committed; New Hampshire also has jurisdiction. So the clause is not at issue.

The Exclusive Legislation Clause has been used to limit a state's authority to regulate activities on U.S. military bases

-36-

and similarly exclusive federal areas/buildings absent permission from Congress.  See, e.g., United States v. State Tax Comm'n, 412 U.S. 363, 372-73 (1973); Collins v. Yosemite Park & Curry Co., 304 U.S. 518, 527-30 (1938); see also S. Lipsky, The Citizen's Constitution 81 (2009) ("In 43 Federalist, Madison offers a straightforward explanation for this clause: 'The public money expended on such places, and the public property deposited in them, require that they should be exempt from the authority of the particular State.'").

Finally, there is no basis for a venue objection when the trial took place in Concord, New Hampshire, and a judge from the District of Maine sat because the New Hampshire judges were recused.  See, e.g., United States v. Scott, 270 F.3d 30, 35 (1st Cir. 2001).

2.      Riley's Objections to His Representation Fail

        a.      Riley's Sixth Amendment Right to Represent Himself Was Not Violated

Through his counsel on appeal, Riley argues that his Sixth Amendment right to proceed without counsel, recognized in Faretta v. California, 422 U.S. 806 (1975), was violated at trial.

We give a brief chronology of Riley's representation.  On September 13, 2007, Riley made his initial appearance and asked that counsel be appointed.  His first attorney was appointed that day and moved to withdraw less than three weeks later, on October 2, 2007.  On October 22, 2007, Riley moved to proceed without

counsel. The court allowed the first counsel to withdraw, but it denied without prejudice Riley's motion because the court was not convinced that Riley's waiver of counsel was knowing and voluntary. At the same time, it appointed a second lawyer to represent Riley.

On December 7, 2007, the court held a brief hearing on Riley's renewed request to proceed without a lawyer, granted the request, and converted the second lawyer to standby counsel.

On March 14, 2008, at a pretrial conference, Riley changed his mind and requested that his standby counsel represent him at trial. The court granted his request and counsel did represent Riley at trial, which started on March 20, 2008.

Riley's argument seems to proceed in several parts. First, Riley acknowledges that he was allowed to proceed without counsel earlier,[10] when he claimed his right to self-representation. The court then appointed standby counsel. He does not complain about having been appointed standby counsel. See McKaskle v. Wiggins, 465 U.S. 168, 176-77 (1984) (describing the role of standby counsel).

On March 14, six days before trial, Riley asked the court to permit his then-standby counsel to represent him at trial. Riley concedes, and the record is quite clear, that he made this

_____

[10] To the extent that Riley claims he did not ask for counsel to be appointed at his first appearance, the record flatly contradicts his assertion. Riley also makes a separate complaint, which we discuss later, that his first appointed counsel provided ineffective assistance.

request and the court granted it.[11]  Riley's complaint on appeal is that he felt he was "forced" into asking for appointed counsel because he did not feel prepared to represent himself at trial. This feeling was apparently connected to problems he had getting documents when he was representing himself but had standby counsel.

This scenario does not come close to invalidating Riley's voluntary, "knowing[,] and intelligent[]" waiver of his right to proceed without counsel.  Faretta, 422 U.S. at 835.  He was "literate, competent, and understanding," id., and he voluntarily exercised his informed free will when he asked for trial counsel. He was not forced to do anything.  As to difficulties in Riley's self-representation, the court did address his concerns about delays in getting certain trial materials when Riley requested trial counsel.

The record is clear that defendant "kn[ew] what he [wa]s doing and his choice [wa]s made with eyes open."  Adams v. United States ex rel. McCann, 317 U.S. 269, 279 (1942).

---

[11]     There was no abuse of discretion in the district court's denial of a continuance of the trial date to Riley's counsel, who had been involved in the case for almost six months.  Riley has failed to "identify specific ways in which the court's [purportedly] erroneous denial of a continuance prejudiced his . . . defense."  United States v. Rodriquez-Marrero, 390 F.3d 1, 22 & n.10 (1st Cir. 2004).

-39-

b.     Riley's Ineffective Assistance of Counsel Claim Is Premature

Riley's second claim as to counsel, presented for the first time on appeal, is that his first appointed counsel had a conflict of interest and therefore provided ineffective assistance. This claim was not developed before the trial court and Riley's brief is devoid of citation to any facts.

This claim is a poster child for invoking the rule that we will decline to hear fact-dependent ineffective assistance claims presented for the first time on appeal.  United States v. Uribe-Londoño, 409 F.3d 1, 4 (1st Cir. 2005); United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993) (collecting cases).  We routinely apply that rule to ineffective assistance claims under Strickland v. Washington, 466 U.S. 668 (1984), including conflict-of-interest claims.  E.g., United States v. Torres-Rosario, 447 F.3d 61, 64 (1st Cir. 2006).

3.     Riley's Remaining Claims Related to the Trial Are Meritless

a.     Riley Was Not Denied the Opportunity to Present a Self-Defense Theory at Trial

Riley asserts, for the first time on appeal and without any citation to the record, that the district court did not allow him to argue a theory of self-defense as an affirmative defense to his crimes.  At trial, the district court asked if any defendant intended to assert this theory.  Riley's counsel explicitly responded that he had no intention of doing so.  Riley never

-40-

requested a jury instruction on self-defense, nor has he cited a single instance in which he was denied an opportunity to introduce evidence on this theory. The argument fails.

b. Riley Was Properly Convicted under Count 6, Though He Was Already Subject to an Enhanced Penalty for Using a Dangerous Weapon

Riley challenges his conviction on Count 6, for carrying, using, or possessing a firearm or destructive device in connection with a crime of violence, 18 U.S.C. § 924(c)(1)(A)-(B). Relying on a 1980 case, Busic v. United States, 446 U.S. 398 (1980), he urges, for the first time on appeal, that his conviction on this count was precluded by the fact that he was already subject to a penalty enhancement for the use of a dangerous weapon for his conviction under Count 2, 18 U.S.C. § 111(a)(2). See Busic, 446 U.S. at 399-400 (holding that § 924(c) does not apply to a defendant "who uses a firearm in the course of a felony that is proscribed by a statute which itself authorizes enhancement if a dangerous weapon is used"). This argument fails.

Congress explicitly "amended § 924(c) to include a mandatory penalty for the use of a firearm during a federal crime of violence and to statutorily overrule . . . Busic." United States v. Centeno-Torres, 50 F.3d 84, 85 (1st Cir. 1995) (per curiam) (footnote omitted); see also id. ("Congress intended to completely revise § 924(c) so that it would serve as a cumulative

-41-

punishment in addition to that provided for the underlying violent crime.").

4.      <u>There Was No Error in the Verdict Form or Jury Instructions</u>

      a.      <u>The District Court's Instructions on Reasonable Doubt Were Correct</u>

Gerhard and Gonzalez claim the court committed reversible error when it instructed that

> [a] reasonable doubt does not mean a mere possibility that the defendant may be not guilty; nor does it mean a fanciful or imaginary doubt, nor one based upon groundless conjecture. It means a doubt based upon reason.

They argue there was a reasonable likelihood the jury misunderstood the reasonable doubt standard. See <u>Victor</u> v. <u>Nebraska</u>, 511 U.S. 1, 6 (1994) (noting that the correct standard for prejudice is not whether jurors <u>could</u> have applied an instruction unconstitutionally but whether there is a reasonable likelihood the jurors did so). Their objections are misplaced both as to the specific language cited and in the context of the instructions overall.

Defendants concede it is permissible to instruct the jury that doubt may not be imaginary or speculative, but they say even a small doubt may be enough to be a reasonable doubt. They rely on <u>Cage</u> v. <u>Louisiana</u>, 498 U.S. 39 (1990) (per curiam), <u>overruled in part by</u> <u>Estelle</u> v. <u>McGuire</u>, 502 U.S. 62, 73 n.4 (1991), which stated that certain terms, not those used here, impermissibly

suggest a higher degree of doubt than is in fact required.  Id. at 41.

In Victor, the Supreme Court expressly found no error in an instruction that reasonable doubt is "not a mere possible doubt."  511 U.S. at 17.  There, as here, the phrase was followed by a description that reasonable doubt is not "some possible or imaginary doubt."  Id.  Following the command of Victor, we have found no error in similar instructions.  See United States v. Rodriguez, 162 F.3d 135, 145-46 (1st Cir. 1998).

The language under attack, in any event, must be seen against the charge as a whole.  Id. at 145.  In its instructions to the jury, the court repeatedly emphasized the presumption of innocence and the government's burden of proof.  The reasonable doubt instruction was not error and there was no reasonable likelihood the jury was misled.

b.    There Was No Error in the District Court's Instruction that U.S. Marshals Are Employees of the United States

When instructing the jury on Counts 1 and 2A, which alleged conspiracy to prevent federal officers from discharging their duties, 18 U.S.C. § 372, and to impede them in the discharge of those duties, id. §§ 371 and 111(a), the district court explained "that employees of the United States Marshals Service are in fact officers of the United States."  Since both § 372 and

-43-

§ 111(a) refer to federal officers, we will assume this is an element of the crimes.

The supposed error was that the jury was prevented from finding an element of a crime and that under Apprendi v. New Jersey, 530 U.S. 466 (2000), this purported error could not be harmless. The argument is confused and wrong.

First, as a matter of law, it is true that employees of the USMS are officers of the United States. See, e.g., 28 U.S.C. § 566. Defendants, indeed, did not say differently at trial or on appeal. There can be no Apprendi error on a statement of law.

Second, perhaps defendants mean to argue there was a fact question as to whether the people who defendants conspired "to prevent" or "assault[], resist[], oppose[], impede[], intimidate[], or interfere[] with" were federal officers. They made no such objection at trial and cannot with a straight face make that argument here.

Finally, defendants have misrepresented the law. Even if there were a failure to submit an element of an offense to the jury, that failure would be subject to the Neder harmless-error rule. Neder v. United States, 527 U.S. 1, 19 (1999). Apprendi, contrary to defendants' argument, does not alter the Neder rule. The Supreme Court has, post-Apprendi, repeated that a trial court's "failure to instruct a jury on all of the statutory elements of an offense is subject to harmless-error analysis." Mitchell v.

-44-

Esparza, 540 U.S. 12, 16 (2003); see also Washington v. Recuenco, 548 U.S. 212, 222 (2006).

### c. The District Court Correctly Instructed that the Jury Could Find Just One Defendant Guilty of Conspiracy

During its deliberations, the jury asked the court if it had to find "either two or three of the defendants guilty [of conspiracy] for any of the defendants to be guilty." (emphasis added). The question had to do with the defendants, and not with other persons. After discussing the question with all parties, the court responded:

> The answer to your question is no. You need not find either two or three of the defendants guilty for any of the defendants to be guilty. You should still refer to the definition of a conspiracy as set forth in the instructions.

The conspiracy instructions, in turn, had referred to an agreement "between at least two people." Riley perfunctorily argues, as he did before the district court, that the instruction "in effect entirely negated the requirement that a conspiracy involve an agreement between two or more defendants." We review his claim de novo, United States v. Luisi, 482 F.3d 43, 51 (1st Cir. 2007), and find it utterly without merit.

The court's answer to the query was accurate and explicitly referred back to its instruction on conspiracy. When multiple defendants are charged with conspiracy, a jury may convict just one of them. United States v. Rogers, 121 F.3d 12, 16 (1st

-45-

Cir. 1997).  Further, the indictment in this case alleged that defendants had conspired with "other individuals."  In light of the evidence presented at trial, the jury could certainly have found that a single defendant was guilty of conspiring with people other than his co-defendants.

> ### d.    The Defendants Were Properly Convicted by General Verdict on Count 2

Gerhard and Riley urge that the verdict form was deficient for Count 2 because it did not allow the jury to specify which object of the dual-object conspiracy charged in that count was the basis for its verdict.  Count 2 charged defendants with conspiracy to interfere with federal officers in the discharge of their duties, in violation of §§ 371 and 111(a) (Count 2A), as well as conspiracy to be an accessory after the fact in violation of §§ 371 and 3 (Count 2B).

Relying on challenges to the legality of Counts 2A and 2B that we rejected above, defendants assert that the guilty verdict on Count 2 must be vacated because the form's phrasing resulted in uncertainty as to the particular object(s) of the conspiracy on which the jury relied and one or both of them may have been legally insufficient.[12]  The Supreme Court has held that a jury may render

---

[12]    The court instructed the jury that it could find defendants guilty if the government carried its burden as to either object of the conspiracy.  The pertinent part of the instructions stated that the jury could only render a guilty verdict if it found that a defendant joined in an agreement "to either (A) assault, resist, or impede officers of the United States in the discharge of

a general verdict on a multiobject conspiracy, provided (1) the evidence is sufficient with respect to any one of the acts charged, and (2) the jury could not have relied on a defective legal theory. Griffin v. United States, 502 U.S. 46, 59-60 (1991); see also Sochor v. Florida, 504 U.S. 527, 538 (1992); United States v. Capozzi, 486 F.3d 711, 718 (1st Cir. 2007). Since defendants have made no meritorious challenges to the legal or evidentiary sufficiency of either Count 2A or Count 2B, their argument necessarily fails. E.g., Griffin, 502 U.S. at 59-60.

      e.    <u>The Jury Was Properly Instructed in the Disjunctive on Count 2</u>

Gonzalez makes a related claim, urging that Count 2 must be vacated because the indictment charged defendants with violating <u>both</u> Counts 2A and 2B and the jury was instructed that it could find defendants guilty on the basis of <u>either</u> object of the conspiracy. We review Gonzalez's preserved argument de novo, United States v. González-Vélez, 466 F.3d 27, 34 (1st Cir. 2006), and reject it.

We have routinely affirmed the use of the conjunctive in indictments followed by the use of the disjunctive in jury instructions. See Capozzi, 486 F.3d at 717 ("The indictment

_____

their duties, or (B) receive, relieve comfort or assist Edward and Elaine Brown in order to hinder and prevent their apprehension, trial and punishment." The verdict form required the jury to indicate whether it found each defendant guilty "of conspiracy to hinder or prevent the U.S. Marshals in attempting to arrest Edward and Elaine Brown." No party objected to the form of the verdict.

followed the usual practice of using the conjunction 'and' in reference to the planned offenses, but guilt can be established by adequate proof on any one of the . . . charged grounds.") (citing Griffin, 502 U.S. at 59-60); see also United States v. Mitchell, 85 F.3d 800, 810-11 (1st Cir. 1996).

Gonzalez attempts to distinguish our precedents, which address general verdicts, by urging that what the jury rendered was a special verdict on Count 2. Not so. Neither defendants nor the government requested a special verdict, and a straightforward reading of the verdict form and jury instructions confirms that the jury reached a general verdict.[13] See United States v. Riccio, 529 F.3d 40, 47 (1st Cir. 2008); see also Black v. United States, 130 S. Ct. 2963, 2968-69 & n.11 (2010) (noting that the Federal Rules of Criminal Procedure only provide for general verdicts and cautioning against using special verdicts in most criminal trials).

5. Defendants' Convictions on Counts 2B and 3 Were Supported by Sufficient Evidence

Gerhard and Gonzalez argue that the evidence was insufficient to convict them on Count 2B, 18 U.S.C. §§ 371 and 3 (conspiracy to be an accessory after the fact), and Count 3, id. § 3 (being an accessory after the fact). Defendants argue that because there was no evidence they were aware of the specific

---

[13] For the same reason, we reject Gonzalez's related challenge to his sentence, anchored in his erroneous assertion that he was wrongly sentenced on both objects of the Count 2 conspiracy, though the jury's "special verdict" only found him guilty of one.

elements of the crimes the Browns were convicted of committing, the government could not satisfy the "knowledge" component of the accessory statute. Our review is de novo. We have already rejected the legal premise for the argument;[14] in any event, the evidence on this point was ample.

Both Gerhard and Gonzalez were aware the Browns had been convicted of federal tax crimes and acted with that knowledge. Evidence at trial included two newspaper articles, written by Gerhard in February or March of 2007, in which he reported that the Browns had been convicted in January 2007 of "conspiring to commit tax fraud, conspiring to disguise large financial transactions and disguising large financial transactions," and that Elaine Brown was also convicted of "evading income taxes and failing to withhold taxes from her employees." Gonzalez acknowledged discussing the Browns' tax-related convictions with Edward and Elaine Brown shortly after his April 2007 arrival in New Hampshire. That suffices.

## C. Arguments Related to Sentencing

Each defendant argues his sentence was too harsh and based on error.

---

[14]    Once again, there is no need for us to address the unrelated situation of a defendant charged with assisting an offender before that offender's conviction. Cf. Graves, 143 F.3d at 1190.

Gerhard received an above-guidelines sentence of 240 months' imprisonment, consisting of 72 months on Count 1, 60 months on Counts 2 and 3, to run concurrently with each other but consecutively to Count 1; and 108 months on Count 4, to be served consecutively to the terms imposed on the other counts. Gerhard's guidelines sentencing range was 57 to 71 months' imprisonment.

Gonzalez received an above-guidelines sentence of 96 months' imprisonment, consisting of 60 months on Count 2 and 36 months on Count 3, to be served consecutively. Gonzalez's guidelines sentencing range was 41 to 51 months' imprisonment.

Riley received a sentence of 432 months' imprisonment, consisting of 72 months on Count 1, 25 months on Counts 2 and 3 to run concurrently with each other and with Count 1, and 360 months on Count 6 to be served consecutively to the terms imposed on Counts 1 through 3. Riley's guidelines sentencing range was 78 to 97 months' imprisonment, and his conviction on Count 6 carried a minimum sentence of 360 months, 18 U.S.C. § 924(c)(1)(B)(ii).

Defendants' sentencing claims fall into three groups: (1) Gerhard and Riley's argument that the district court was unable to calculate their accessory sentences on Count 3 because the sentences for the crimes to which they were accessories were not determined, (2) an unpreserved argument from all three defendants that they were improperly sentenced on Count 2, and (3) additional

challenges by Gerhard and Gonzalez.  Each of defendants' claims fails.

"We review [preserved] claims of sentencing error in the application of the guidelines on a sliding scale.  Pure issues of law, such as interpretations of the guidelines, are reviewed de novo; findings of fact are reviewed for clear error; and there is a continuum between those two poles." United States v. Stella, 591 F.3d 23, 27 (1st Cir. 2009); United States v. Sicher, 576 F.3d 64, 70-71 (1st Cir. 2009).

1.      Gerhard and Riley Were Properly Sentenced as Accessories after the Fact, 18 U.S.C. § 3

Accessories after the fact may receive sentences up to "one-half the maximum term of imprisonment" to which the principals were exposed.  18 U.S.C. § 3.  In a variation on claims we have rejected, Gerhard and Riley say, for the first time on appeal, that absent a showing of the Browns' specific crimes of conviction, the district court could not calculate their accessory sentences. Defendants' argument relies on a faulty premise.  Gerhard and Riley's respective Pre-Sentence Reports ("PSR") did specify the Browns' crimes of conviction and the district court could rely on this information.  See United States v. Olivero, 552 F.3d 34, 40 (1st Cir. 2009).

Both PSRs reported the Browns' most serious conviction.[15] It carried a maximum penalty of 120 months' imprisonment. 31 U.S.C. § 5324(d)(2). This meant Gerhard and Riley were subject to up to 60 months' imprisonment on Count 3. Gerhard's 60-month sentence and Riley's 25-month sentence on that count were proper.

The defendants cannot plausibly argue that the factual basis for their sentences unduly surprised them at sentencing. See Olivero, 552 F.3d at 40; see also Irizarry v. United States, 128 S. Ct. 2198, 2203 (2008).

2.      The Defendants Were Properly Sentenced on Count 2

All three defendants claim that the district court erred by sentencing them to more than 12 months' imprisonment on Count 2. They urge that without the specifics of the Browns' convictions, no sentence could be calculated for Count 2B, eliminating that count as a basis for their sentences. They say that the only remaining count, Count 2A, was a "simple assault" misdemeanor, subject to a maximum sentence of 12 months.[16] See 18 U.S.C. § 111.

---

[15] When more than one underlying offense is at issue, courts should use the most serious offense to calculate a defendant's guidelines range. U.S.S.G. § 1B1.5 comment. (n.3).

[16] When calculating a defendant's guidelines range, conviction of a conspiracy to commit more than one offense is treated "as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." U.S.S.G. § 1B1.2(d). As a result, the district court considered Counts 2A and 2B separately.

Defendants' argument is precluded by our determination that the court could sentence them on Count 2B for conspiring to be accessories after the fact. That alone defeats their claim. In any event, the evidence does not at all support a conclusion that only a simple misdemeanor assault was involved under Count 2A.

3.    <u>Gerhard and Gonzalez's Remaining Sentencing Claims Fail</u>

a.    <u>The District Court Did Not Err by Applying U.S.S.G. § 2J1.2 to Gerhard's Count 1 Conviction</u>

Since the guidelines do not specify a base offense level for violations of 18 U.S.C. § 372 (conspiracy to prevent an officer from discharging his duties), the district court determined the most analogous guideline. The court used U.S.S.G. § 2J1.2, the obstruction-of-justice guideline, which has a base offense level of 14. Gerhard claims that the district court erred by not using U.S.S.G. § 2A2.4, which governs convictions for obstructing or impeding officers and has a base offense level of 10. We disagree.

Gerhard's argument relies in significant part on his already rejected assertion that Count 1 involved the "same substantive offense" as Count 2A, 18 U.S.C. §§ 371 and 111(a) (conspiracy to interfere with an officer in the midst of discharging his duties), to which the district court applied U.S.S.G. § 2A2.4.

On the evidence before it, the district court found that Gerhard conspired to thwart USMS efforts to arrest the Browns, wanted after their convictions, and so obstructed the

-53-

administration of justice. No more was needed. Not all conspiracies to prevent federal officers from discharging their duties will involve obstruction of justice; this one did.

b. The District Court Did Not Abuse Its Discretion by Running Gerhard's Sentence on Counts 2 and 3 Consecutive to His Sentence on Count 1

Gerhard perfunctorily argues that the district court abused its discretion by imposing consecutive sentences on Count 1 and Counts 2 and 3 because the resulting sentence was too severe. He does not argue there was any procedural error, and there was none.

The district court used the sentencing factors in 18 U.S.C. § 3553(a) to frame Gerhard's sentence, citing, among other facts, Gerhard's purchase of "extremely dangerous weapons" and "bomb components" for the Browns, his willingness to use force to protect them, and his evident "intent to continue his conduct and endanger the community." Based on information in Gerhard's PSR, as well as testimony at sentencing from a deputy U.S. Marshal and a prisoner who had conversed with Gerhard after his arrest, the court also noted that Gerhard had joined the U.S. Army "to learn more about explosives" and hoped to emulate Oklahoma City bomber Timothy McVeigh. The sentence received was well within the court's discretion. See United States v. Ziskind, 471 F.3d 266, 268-69, 271 (1st Cir. 2006).

c.    Gerhard's Challenges to the District Court's Guidelines Calculations as to Counts 2 and 3 Are, at Most, Harmless Error

Gerhard raises four additional objections to the district court's guidelines calculations as to Counts 2 and 3. We bypass the merits of these arguments because neither of these counts had any impact on Gerhard's guidelines range. See United States v. Rivera, 448 F.3d 82, 86 n.1 (1st Cir. 2006); United States v. Caldwell, 358 F.3d 138, 143 (1st Cir. 2004).

The district court grouped Counts 1, 2B, and 3 together. The total offense level for that group, 25, was derived entirely from Count 1, the most serious offense. See U.S.S.G. § 3D1.3(a). Count 2A was grouped separately and assigned a total offense level of 10. Because Count 2A's offense level was more than nine levels less serious than the group with the highest offense level, the district court disregarded it when calculating Gerhard's guidelines range. See U.S.S.G. § 3D1.4(c). In short, only Counts 1 and 4 impacted Gerhard's guidelines range.[17] Any guidelines error as to Counts 2 and 3 was harmless. E.g., Rivera, 448 F.3d at 86 n.1.

---

[17]    Gerhard's guidelines sentence on Count 4, 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a crime of violence) was the mandatory-minimum sentence required by statute to be imposed separately and consecutively to the other counts. U.S.S.G. § 2K2.4(b). Gerhard does not object to the district court's calculation for Count 4.

-55-

d.     <u>The District Court Properly Imposed Obstruction-of-Justice Enhancements to Gonzalez's Sentence</u>

The district court imposed the obstruction-of-justice enhancement, U.S.S.G. § 3C1.1, when calculating Gonzalez's guidelines sentence. The court cited fourteen separate examples of perjury by Gonzalez, which he does not contest on appeal, and, further, an instance in which Gonzalez personally instructed the jury that "Jury nullification is your right," which he does contest. The district court found that these incidents, individually and cumulatively, merited imposing the enhancement.

Gonzalez's argument about his jury nullification statements is beside the point. <u>Cf.</u> <u>United States</u> v. <u>Manning</u>, 79 F.3d 212, 219 (1st Cir. 1996). The perjury findings were independently sufficient to justify the enhancement. <u>See, e.g.</u>, <u>United States</u> v. <u>Shinderman</u>, 515 F.3d 5, 19-20 (1st Cir. 2008); <u>United States</u> v. <u>Meada</u>, 408 F.3d 14, 24-25 (1st Cir. 2005).

e.     <u>The District Court Did Not Err by Imposing a Sentencing Enhancement for Gonzalez's Use of a Dangerous Weapon under U.S.S.G. § 2A2.4(b)(1)(B)</u>

Gonzalez claims that the district court erred by imposing a three-level enhancement for use of a dangerous weapon, U.S.S.G. § 2A2.4(b)(1)(B). He argues that this conduct constituted a distinct, charged offense, which the jury rejected when it hung on the possession-in-furtherance count, 18 U.S.C. § 924(c), and that sentencing may not be based on acquitted conduct. He is mistaken.

"[A]cquitted conduct, if proved by a preponderance of the evidence, . . . may form the basis for a sentencing enhancement." United States v. Gobbi, 471 F.3d 302, 314 (1st Cir. 2006); see also id. at 313-14 (rejecting a defendant's challenge to a dangerous-weapon enhancement imposed despite acquittal on a § 924(c) charge). At trial, the evidence against Gonzalez included (1) video of him carrying a rifle over his shoulder while walking behind Edward Brown, (2) his testimony that he brought two guns with him to New Hampshire and purchased an additional .50 caliber rifle that he kept with him on the Browns' property, (3) his recorded statement that he served as "volunteer security" for the Browns, and (4) his declaration in an interview with a media correspondent that he and other supporters of the Browns had "weapons and . . . [we]re going to defend [them]selves." On these facts, the district court could easily have found the enhancement was warranted.

f.      Any Error in Calculating Gonzalez's Guidelines Range on Counts 2B and 3 Was Harmless

The district court used U.S.S.G. § 2J1.2 (obstruction of justice) as the base offense level for Gonzalez's convictions on Counts 2B and 3. Gonzalez claims a lower offense level was appropriate on both counts because he was not charged with obstructing justice.

We need not resolve this purported guidelines issue, as the errors, if any, would not have affected the district court's sentence. United States v. Marsh, 561 F.3d 81, 86 (1st Cir. 2009);

-57-

<u>United States</u> v. <u>Teague</u>, 469 F.3d 205, 209-10 (1st Cir. 2006). After calculating Gonzalez's guidelines sentence, the district court explicitly stated that it considered a longer, 96-month sentence "sufficient, but not greater than necessary, to effectuate the goals of 18 U.S.C. § 3553(a)," citing "the seriousness of the offense, the need to promote respect for the law, the need for just punishment and the need for general and specific deterrence, as well as the need to protect the public from further crimes."

The district court noted, in particular, that Gonzalez went to the Browns' "prepared to intimidate, prevent and, if necessary, kill members of the [USMS] or other law enforcement officers should they attempt to enforce a lawful order" and acquired weapons capable of delivering on his threats. The court observed that "[i]t was only because of the restraint of the [USMS] that a significant number of individuals were not injured or killed." It cited Gonzalez's defiant attitude during trial and allocution and determined that "he remains a serious danger to the community." Any error in the court's guidelines calculation would not have affected Gonzalez's sentence.

### III. Conclusion

This was a difficult case and the trial court handled it well. Defendants' convictions and sentences are <u>affirmed</u>.